# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 17, 2005 Session

## STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES, v. T.M.B.K.

### Appeal from the Juvenile Court for Hamilton County
### No. 190,495-96    Suzanne Bailey, Judge

---

### No. E2005-00604-COA-R3-PT - FILED FEBRUARY 8, 2006

---

In this appeal, T.M.B.K. ("Mother") contends that the trial court erred in terminating her parental rights and that the trial court lacked jurisdiction to adjudicate the initial child custody proceeding. After careful review of the evidence and applicable authorities, we hold that the trial court had subject matter jurisdiction and the evidence does not preponderate against the trial court's finding by clear and convincing evidence of abandonment and substantial noncompliance with the permanency plan. We futher hold that the evidence preponderates against the trial court's finding by clear and convincing evidence of a failure to remedy persistent conditions. Therefore, we affirm in part and reverse in part.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part; Reversed in Part; Case Remanded

SHARON G. LEE, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and D. MICHAEL SWINEY, JJ., joined.

D. Marty Lasley, Chattanooga, Tennessee, for the Appellant, T.M.B.K.

Paul G. Summers, Attorney General and Reporter, and Douglas Dimond, Senior Counsel, General Civil Division, Nashville, Tennessee, for the Appellee, State of Tennessee, Department of Children's Services.

**OPINION**

**I.**

*Background and Procedural History*

This case involves a twenty six year old mother with a ninth grade education. She is dyslexic and has a limited ability to read, write and spell. She has no driver's license, no vehicle, and no home of her own. Mother's three children are Ernest B. (born December 15, 1998) who was fathered by Ernest W.; Ashley W. (born September 25, 2001) who was fathered by either Ernest W. or Antonio P.; and Christian W. (born November 14, 2002) who was fathered by Ernest W. The parental rights of Ernest W. and Antonio P. to the children were terminated by previous order and are not involved in this appeal. Mother's parental rights to the oldest child, Ernest B., were previously terminated and are not involved in this case. This appeal only concerns Mother's rights to Ashley W. and Christian W. ("the children").

On February 21, 2003, Mother and the children were living with her boyfriend, Ernest W. While the children were in the home, Ernest W. physically assaulted Mother by cutting her ear ("it was like the left side of my ear was like sort of ripped off"), blacking her eyes, choking her, kicking her, and pulling a knife on her. Mother admitted that Ernest W. had been violent and abusive towards her on this date and in the past, but explained that the abuse was directed towards her, not the children, and was only occasional - not an everyday thing. Following the February 21, 2003, episode, the police were called and Ernest W. was arrested. Mother loaded up her children and her possessions and moved from Chattanooga across the Tennessee state line to Rossville, Georgia, where she signed a lease for a mobile home. Ernest W. followed Mother to Georgia and rented a trailer in the same mobile home park.

On March 13, 2003, a protective custody order was entered in the Juvenile Court of Hamilton County, Tennessee, providing that the children were dependent and neglected and "subjected to an immediate threat to their health and safety to the extent that delay for a hearing would be likely to result in severe and irreparable harm; and there is no less drastic alternative to removal available." The order transferred custody of the children to the Department of Children's Services ("DCS").

Permanency plans were developed by DCS for the children. Mother signed the permanency plan on May 30, 2003, indicating that she participated in the development of the plan, that the plan had been discussed with her, that she had been provided a written copy of the permanency plan, but that she did not agree with the plan.

On May 12, 2004, following a hearing, the trial court suspended Mother's visitation with the children based on her failure to attend scheduled visitations. Mother had only attended five of the previous fourteen available visitations.

On March 15, 2004, DCS filed a petition to terminate the parental rights of Mother on the grounds of abandonment by willfully failing to visit and support; failure to comply in a substantial manner with the permanency plan; and failure to remedy the persistent conditions that led to the removal of the children from the home.

Mother filed a motion to dismiss asserting that the trial court lacked jurisdiction. Following a hearing, the trial court found that Tennessee was the home state of the children at the time the petition for temporary custody was filed and dismissed Mother's motion.

On February 2, 2005, following a bench trial, the court terminated Mother's parental rights, finding by clear and convincing evidence that the children had been in the custody of DCS for at least six months; that numerous services had been offered to Mother by DCS and other agencies in an attempt to help her achieve reunification with her children, but that Mother did not take advantage of those services; that Mother willfully abandoned the children by failing to pay child support even though she was employed; that she failed to establish a suitable home for the children; that she had failed to substantially comply with the requirements of the Permanency Plan; that the conditions which led to the removal of the children had not been remedied; and that termination of Mother's parental rights was in the childrens' best interest. The trial court did not terminate Mother's parental rights on the ground of abandonment based on Mother's failure to visit. Mother appeals the trial court's decision.

## II.

### *Issues on Appeal*

We address the following issues in this appeal:

> 1) whether the trial court had jurisdiction for the initial removal of the minor children from the Mother; and

> 2) whether the trial court's finding of grounds for termination is adequately supported by the evidence.

## III.

### *Standard of Review*

A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2059-60 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-579 (Tenn. 1993); *Ray v. Ray*, 83 S.W.3d 726, 731 (Tenn. Ct. App. 2001). Although this right is fundamental and superior to claims of other persons and the government, it is not absolute. *State v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). It continues without

interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988)(*citing Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute. *Id.*

Termination proceedings are governed by statute in Tennessee. Parties who have standing to seek the termination of a biological parent's parental rights must first prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1). Secondly, they must prove that termination of the parent's rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2). Because the decision to terminate parental rights has profound consequences, courts must apply a higher standard of proof in deciding termination cases. Therefore, to justify termination of parental rights, the party seeking termination must prove by clear and convincing evidence the ground (or grounds) for termination and that termination is in the child's best interest. Tenn. Code Ann. §36-1-113(c); *In re Valentine*, 79 S.W. 3d 539, 546 (Tenn. 2002).

The heightened burden of proof minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003) *no appl. perm. filed*, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In a non-jury case such as this one, we review the record *de novo* with a presumption of correctness as to the trial court's determination of facts, and we must honor those findings unless the evidence preponderates to the contrary. Tenn. R. App. P. 13(d); *Union Carbide v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings. *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999). Further, "[o]n an issue which hinges on the credibility of witnesses, the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings." *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1990), citing *Tennessee Valley Kaolin Corp. v. Perry*, 526 S.W.2d 488, 490 (Tenn. Ct. App. 1974). The trial court's specific findings of fact are first reviewed and are presumed to be correct unless the evidence preponderates against them. We then determine whether the facts, either as found by the trial court or as supported

by the preponderance of the evidence, clearly and convincingly establish the grounds for terminating the biological parent's parental rights. *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004). The trial court's conclusions of law are reviewed *de novo* and are accorded no presumption of correctness. *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993).

## IV.

### *Subject Matter Jurisdiction*

The first issue we address is whether the trial court had subject matter jurisdiction at the commencement of the child custody proceeding which resulted in the removal of the children from Mother. Mother asserts that when DCS filed the petition for temporary custody of the children on March 13, 2003, she and the children resided in Rossville, Georgia and that Tennessee did not have subject matter jurisdiction to initiate a child custody proceeding. Mother further argues that "jurisdiction exists in only one state at a time," *Brown v. Brown*, 847 S.W.2d 496 (Tenn. 1993), and if Tennessee is not the "home state" of the children, a Tennessee court may assume jurisdiction only upon a finding that no other state qualifies as the children's "home state," or that the "home state" has declined to exercise jurisdiction and deferred to Tennessee as "the more appropriate forum." *Id*. at 500.

Mother's first argument that the trial court did not have jurisdiction to hear the initial dependent neglect case is without merit. This is an appeal from the order terminating Mother's parental rights - not an appeal of the dependency neglect proceeding which was a separate case. *In re M.J.B.*, 140 S.W. 3d 643, 651 (Tenn. Ct. App. 2004). The primary purpose of a dependent neglect proceeding is to provide for the care and protection of children whose parents are unable or unwilling to do so. *Id*. The sole purpose of the termination of parental rights proceeding is to irrevocably sever the legal relationship between parent and child. *Id*. Dependent neglect proceedings are intended to be procedurally "informal." *Id*. In dependent neglect proceedings, juvenile courts may rely on evidence which is helpful in determining the questions presented, including oral and written reports, even though the same evidence is not otherwise competent in the hearing on the termination. *Id*. In dependent neglect proceedings, the final orders are immediately appealable. *Id*. Dependent neglect cases must be appealed to the circuit court, and the circuit court must try the case *de novo* by hearing all the witnesses again and by rendering an independent decision based on the evidence presented at the circuit court hearing. *Id*. Appeals in termination cases are appealed directly to this court and are governed by the Tennessee Rules of Appellate Procedure. *Id*.; Tenn. Code Ann. §§ 36-1-113(q), 122(b)(1), 124(b) (2001). Mother did not appeal the dependent neglect case and therefore that order is final. If the trial court lacked jurisdiction in the dependent neglect case, that issue should have been raised in that case. Whether the trial court had jurisdiction to enter an order removing the children from Mother's home after the February 21, 2003, fight with Ernest W. is, as the old saying goes, water under the bridge, and not an issue that we can review in this appeal.

However, we will review Mother's jurisdictional argument to the extent that Mother argues that the termination proceedings originated from custody proceedings which were based on an order which was invalid on jurisdictional grounds. The Uniform Child Custody Jurisdiction and Enforcement Act, codified at Tenn. Code Ann. § 36-6-201, *et seq*., provides in pertinent part:

> This part shall be liberally construed and applied to promote its underlying purposes and policies. This part should be construed according to its purposes, which are to:
>
> (1) Avoid jurisdictional competition and conflict with courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well-being;
>
> (2) Promote cooperation with the courts of other states to the end that a custody decree is rendered in that state which can best decide the case in the interest of the child;
>
> (3) Discourage the use of the interstate system for continuing controversies over child custody;
>
> .    .    .    .
>
> (5) Avoid relitigation of custody decisions of other states in this state; and
>
> (6) Facilitate the enforcement of custody decrees of other states.

Tenn. Code Ann. § 36-6-202.

In resolving the present jurisdictional issue, the threshold question we must answer is whether either or both of the children have a "home state" as that term is defined in Tenn. Code Ann. § 36-6-205(7), which states:

> "Home state" means the state in which a child lived with a parent or a person acting as a parent for at least six (6) consecutive months immediately before the commencement of a child custody proceeding. In the case of a child less than six (6) months of age, "home state" means the state in which the child lived from birth with any of the persons mentioned. A period of temporary absence of any of the mentioned persons is part of the period[.]

Because one child was over the age of six months and one child was under the age of six months at the time of the initial child custody proceeding, we must analyze each child individually.

Christian W. was three months old at the time the dependent neglect petition was filed. He had lived in Tennessee since his birth and until Mother moved to Georgia for a three week period. We consider the three week move to Georgia to be only a temporary absence from the state of Tennessee. Under the clear terms of the statute, Tennessee is the home state for Christian W. and therefore, the Tennessee trial court had jurisdiction to make custody determinations pursuant to Tenn. Code Ann. § 36-6-216(a)(1), which states in pertinent part:

> Except as otherwise provided in [Tenn. Code Ann.] § 36-6-219, a court of this state has jurisdiction to make an initial child custody determination only if:
> (1) This state is the home state of the child on the date of the commencement of the proceeding[.]

Ashley W. was seventeen months old at the time the dependent neglect proceeding was filed. She had lived in Tennessee the entire time except for the three weeks she lived in Georgia. If we assume that the period of time in Georgia was a temporary absence, then Tennessee remained Ashley W.'s home state. However, if we view the move to Georgia as an actual change of residence, then neither Tennessee nor Geogia was Ashley W.'s home state since she had lived neither in Tennessee nor Georgia "at least six (6) consecutive months immediately before the commencement of a child custody proceeding." Tenn. Code Ann. § 36-6-205(7). If this is the case, then Ashley W. did not have a "home state" according to the statute.

When a child does not have a "home state," it is necessary to look at the portion of the statute which confers jurisdiction for custody proceedings for this situation:

> (a) Except as otherwise provided in § 36-6-219, a court of this state has jurisdiction to make an initial child custody determination only if:
>
> (1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six (6) months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state;
>
> (2) A court of another state does not have jurisdiction under subdivision (a)(1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under § 36-6-221 or § 36-6-222, and:
>
> (A) The child and the child's parents, or the child and at least one (1)

> parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and
>
> (B) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships;

Tenn. Code Ann. § 36-6-216(a)(1)&(2).

While home state jurisdiction is given priority over all other types of jurisdiction, the next most important type of jurisdiction is "significant connection jurisdiction" pursuant to Tenn. Code Ann. § 36-6-216(a)(2)(A). Under Tenn. Code Ann. § 36-6-216(a)(2)(A), it must first be determined that neither Tennessee nor Georgia have home state jurisdiction over Ashley W. Having satisfied section (a), we then determine whether pursuant to section (a)(2)(A) & (B), the "child . . . and at least one (1) parent . . . have a significant connection with this state other than mere physical presence; and . . . [s]ubstantial evidence is available in this state concerning the child's care, protection, training, and personal relationships[.]"

Ashley W. and Mother have a more significant connection with Tennessee than Georgia. Ashley W. lived in Tennessee 16 out of the 17 months of her life. Mother's mother lives in Tennessee and Mother has at times lived with her mother when she was unable to maintain a residence for herself. Mother's oldest child and Ashley W.'s brother, Ernest B., was in the Tennessee DCS's custody during the time period in question. Mother had a permanency plan through the Tennessee DCS with which she was to comply in order to regain custody of her oldest child. The Tennessee DCS had been involved with this family for several years and had made available to Mother a host of services to assist her in raising her children. There is no other state, but Tennessee, with any significant connections to Ashley W. and Mother. Mother's move to Georgia was only a brief, temporary move and there is no indication that Mother or Ashley W. established any ties or connections with the state of Georgia. Therefore, Tennessee was the appropriate state to adjudicate the child custody issues involving Mother and her children. We therefore affirm the trial court on the jurisdictional issue.

## V.

### *Grounds for Termination of Parental Rights*

The second issue we address is whether the trial court erred in finding that there were statutory grounds for terminating Mother's parental rights. The trial court found by clear and convincing evidence that Mother abandoned her children by willfully failing to support them; that Mother failed to substantially comply with the permanency plan; and that Mother had failed to remedy persistent conditions that led to the removal. The trial court found three statutory grounds for termination. The existence of any one of the statutory grounds will support a termination of parental rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000). We will review each of the statutory grounds relied upon by the trial court.

A.

*Abandonment by Willfully Failing to Support*

Abandonment by willfully failing to support is one of the statutory grounds for termination of parental rights as set forth in Tenn. Code Ann. § 36-1-113(g) and, as we have noted above, this

is one of the grounds that the trial court relied on in terminating Mother's parental rights. The relevant statutory provisions are as follows:

> *Tenn. Code Ann. § 36-1-113(g)(1)*
>
> (g) Initiation of termination of parental or guardian rights may be based upon any of the following grounds:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;
>
> *Tenn. Code Ann. § 36-1-102(1)(A)(i)*
>
> (1)(A) "Abandonment" means, for purposes of terminating the parental or guardian rights of parents(s) or guardian(s) of a child to that child in order to make that child available for adoption, that:
>
> (i) For a period of four (4) consecutive months immediately preceeding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child;

As to its finding regarding abandonment, the trial court said:

> [Mother] willfully abandoned the Children within the meaning of the law. Specifically, she admits that she has not paid child support since the Children have been in the custody of the Department although she testified that she was employed until approximately three weeks before this hearing. She testified that for a period of time she worked

two jobs. Payment of child support was a requirement of the permanency plans prepared for and presented to the Mother and she was under an Order of the Child Support Division of this court to pay support. When asked about whether she had paid child support by counsel for the Department, the Mother responded "why should I pay support when ya'll came and took them out of my home?" She was aware of and able to fulfill her child support responsibility but she made a voluntary decision not to do so.

It is undisputed that Mother did not make any payments toward the support of the children while they were in the custody of DCS. The statute requires that for a period of four consecutive months immediately preceding the filing of the petition to terminate parental rights of the parent, the parent must have willfully failed to support or make reasonable payments toward the support of the children. Tenn Code Ann. § 36-1-102(1)(A)(i). In this case, the petition was filed on March 15, 2004. As to the four month period before the filing of the petition, Mother testified that she had not made any payments toward the support of the children and that she was employed at that time. It is clear from Mother's testimony that she was aware of her obligation to support the children:

> Q      For most of the time that your children have been in state custody, you have been employed?
>
> A      Yes, sir.
>
> Q      You have had income?
>
> A      Yes, sir.
>
> Q      During the time that your children were in state custody, have you paid support for their maintenance and welfare?
>
> A      No, Sir, I have not.
>
> Q      Why not?
>
> A      *Why should I take and pay when you all took them out of my hands when I was taking care of them[?]*
>
> Q      Okay.
>
> A      I feel that I was doing good for them when they were in my home.
>
> Q      Okay. So you did not pay the support?

-10-

A  No, sir, I have not. I have bought them things. I have bought them things. I have sent Christmas, birthdays and everything.

Q  *The decision not to pay the support was your voluntary decision, is that correct?*

A  *Yes, sir.*

(Emphasis added)

In *In re Audrey S.*, No. M2004-02758-COA-R3-PT, 2005 WL 2051286 at *13, 14 (Tenn. Ct. App. M.S. filed August 25, 2005) *perm. app. denied November 4, 2005*, we discussed the meaning of "willful" conduct in the context of a case involving the termination of parental rights:

> Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.
>
> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. (citations omitted)

Clear and convincing evidence supports the conclusion that Mother willfully failed to support her children in the four months preceding the filing of the petition. Mother admitted she was aware of her duty to support the children. Mother's obligation of support was only $15 per month per child. She admitted she had income, but chose not to support them. Her reason for not paying support -that DCS took custody of them from her - was not a valid excuse for her failure to support. Mother made an unfortunate decision when she decided not to support her children because she begrudged the actions of DCS in taking custody of her children. The trial court found by clear and convincing evidence that Mother abandoned her children under Tenn. Code Ann. § 36-1-102(1)(A)(i) by willfully failing to support them. The evidence does not preponderate against this determination and we affirm the termination of parental rights on this ground.

B.

***Substantial Noncompliance With the Permanency Plan***

The trial court also terminated Mother's parental rights based on Mother's failure to substantially comply with the permanency plan based on Tenn. Code Ann. § 36-1-113(g)(2).

(g) Initiation of termination of parental . . . rights may be based upon
any of the following grounds:

(2) There has been substantial noncompliance by the parent . . . with
the statement of responsibilities in a permanency plan or a plan of
care pursuant to the provisions of title 37, chapter 2, part 4[.]

To prove its case under Tenn. Code Ann. § 36-1-113(g)(2), DCS was required to demonstrate: (1) the requirements of the permanency plan were reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and (2) the parent's noncompliance was substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548-49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. M.S. filed June 3, 2003) *no appl. perm. filed*. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548; *Department of Children's Servs. v. C.L.*, No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at *18 (Tenn. Ct. App. Aug. 29, 2003) *no appl. perm. filed.*, *In re M.J.B.*, 140 S.W.3d 643, 656-57 (Tenn. Ct. App. 2004).

The permanency plan, among other things, required Mother to participate in a complete diagnostic interview and assessment; follow all recommendations of the assessment and if recommended in the assessment, enroll in parenting classes and provide verification of completion; participate in counseling; make every effort to obtain employment and sign up for daycare services for her children; maintain income, including public benefits, adequate to meet basic needs through continuous employment or fulfilling requirements for public benefits; obtain and maintain stable, affordable, safe, clean housing; pay bills for food, housing, utilities, clothing and health care on time to ensure that basic services do not end; participate in budgeting counseling; demonstrate the ability to prioritize in order to meet basic needs (food and clothing); pay child support in the amount of $15.00 per child per month as long as the children are in state custody; visit the children during designated visitation time; avail herself of any and all assistance to help her with her learning disability; and undergo a special evaluation process to determine her level of reading proficiency and how she may be helped.

We must first determine whether the requirements of the permanency were "reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656. It is difficult to determine with certainty from the record the reason or reasons for the removal of the children from the home. The order of removal is conclusory and does not provide the specific factual basis for the removal. The petition for removal is not included in the record. It appears that the event that precipitated the removal of the children from the home was the domestic violence that occurred on February 21, 2003, while the

children were in the home. There are statements by counsel in the record indicating that the children were removed due to violence and instability in the home. Due to an inadequate record, we are unable to determine whether the children were removed due to "instability" in the home and what that "instability" was. Therefore we will review the reasonableness of the conditions only as they relate to remedying the domestic violence in the home.

We note at the outset that the plan does not contain a provision that Mother terminate her relationship with Ernest W. - a seemingly obvious and important factor in remedying the violence in the home, since Ernest W. was the perpetrator of the violence. Plan conditions which required a diagnostic interview, assessment and follow up; enrolling in parenting classes and being required to verify successful completion; participating in counseling; maintaining an income; and maintaining suitable housing - are all reasonable requirements for someone with a history of domestic violence. DCS was attempting by these requirements to equip Mother with the necessary emotional and financial means to break the cycle of domestic violence into which she had fallen. This is certainly a laudable goal and one with lasting benefits to Mother and her children - had Mother chosen to take advantage of the offered assistance. However, it does not appear that in this case *all* provisions of the permanency plan were reasonably related to remedying the violence in the home. The requirement for paying bills, participating in budget counseling, demonstrating the ability to prioritize, and availing herself of assistance with her learning disability, while certainly worthwhile goals and helpful to Mother, were, at least in this case, not directly related to preventing domestic violence in the home.

Mother argues that she complied with the plan because she went to counseling, was employed, had housing, and ended her relationship with Ernest W. We find Mother's efforts to comply were sporadic, inconsistent and not substantial. Mother admitted she did not obtain the psychological assessment. The case worker testified she had arranged appointments for Mother with three different doctors and that Mother never attended any of the appointments. She did attend counseling, but not for very long because she was told she really did not need any counseling. Mother did not provide any proof other than her testimony in this regard. Mother never attended any counseling for domestic violence. Mother did not have stable housing and lived in four different places after the children were removed. At the time of the trial, Mother was living in a three bedroom trailer as a guest of a disabled woman and her disabled nineteen year old son. Mother was unemployed when the case was tried, and her only source of income was food stamps. Mother testified that she ended her relationship with Ernest W. and had not seen him in two years. However, the case worker testified that after Ernest W. physically assaulted Mother and she moved to Georgia with the children, Ernest W. moved into a trailer three doors down. The case worker talked to him on the phone while he was at Mother's trailer on one occasion. Mother admitted to the case worker that after the children had been removed, Ernest W. came to her home, and she gave him a sandwich. Moreover, the case worker testified that on May 17, 2003, nearly three months after the domestic violence episode in which Ernest W. had beaten Mother, the case worker observed him "very comfortable in [Mother's] home that day. He was sitting on the couch, drinking a beer, kicked back with cigarettes, TV going, sorting through a box of plastic fingernails." The trial court determined that Mother was not credible on this issue and concluded that Mother had not ended her relationship

-13-

with Ernest W.  Trial courts are normally in the best position to judge the credibility of the witnesses since they have seen and heard the witnesses testify. *Massengale v. Massengale*, 915 818, 819 (Tenn. Ct. App. 1995).  Thus, a trial court's determination of credibility is entitled to great weight in this court. *Town of Alamo v. Forcum-James Co.*, 205 Tenn. 478, 327 S.W.2d 47, 49 (Tenn. 1959)*, Koch v. Koch*, 874 S.W.2d 571, 577 (Tenn. Ct. App. 1993).  We conclude that the evidence does not preponderate against the trial court's finding that Mother had not ended her relationship with Ernest W. despite the devastating effect Ernest W.'s violence had caused to Mother's ability to care for her children and her relationship with them.

The evidence is clear and convincing that Mother failed to substantially comply with those factors in the permanency plan we find were reasonably related to remedying the domestic violence situation which led to the removal of the children.  While there was some compliance on Mother's part, there was not *substantial* compliance.  Accordingly, we hold that the evidence does not preponderate against the trial court's findings by clear and convincing evidence that Mother failed to substantially comply with the permanency plan, and we affirm the termination of parental rights on that ground.

C.

### *Persistent Conditions*

The trial court found, pursuant to Tenn. Code Ann. § 36-1-113(g)(3), that the children had been removed from the home of Mother for at least six months and that she had failed to remedy the conditions that led to the removal.

*Tenn. Code Ann. § 36-1-113(g)(3)*

> (g) Initiation of termination of parental . . . rights may be based upon any of the following grounds:
>
> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and;
>
> (i) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

-14-

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

The trial court found the following with respect to the issue of failure to remedy persistent conditions and stated as follows:

> The conditions which led to the removal persist or other conditions exist which in all probability would cause the Children to be subjected to further abuse and neglect, thus preventing the Court from giving the Children over to the care and custody of Ms. Kirby. Specifically, she has not substantially completed the requirements of the foster care plan prepared for her to regain custody of the Children. She is currently completely dependent on others for her own food and shelter and is unable to provide a suitable home for the Children now or in the future.

As we have noted previously, the record supports only the one incident of domestic violence as the condition which led to the removal of the children. There is no proof of any domestic violence in the home after the children were removed. Therefore, we do not find that there is clear and convincing evidence that the condition - domestic violence- that led to the children's removal still persists. *State v. C.H.K.*, 154 S.W.3d 586, 592-593 (Tenn. Ct. App. 2004). The trial court found that other conditions exist that would cause the children to be subjected to further abuse and neglect. Clearly, Mother had serious limitations on her ability to parent these children. She had been involved with a man who physically abused her, she had a limited education, she had a learning disability, she did not drive a vehicle, she had a series of health and emotional problems, and her housing was not stable. While common sense tells us that these circumstances were not beneficial to the children, we cannot say, under the limited proof in this record, that there is clear and convincing evidence that the children were neglected or abused by Mother's conduct. We can only speculate that they were. There is no place in a parental termination case -where the stakes are so high- for guesswork and we will not so engage. Accordingly, we reverse the judgment of the trial court on this ground.

VI.

***Best Interest***

The trial court found by clear and convincing evidence, that termination was in the best interest of the children. Mother does not raise this issue on appeal. After reviewing the record, we find that the evidence does not preponderate against this finding by the trial court.

VII.

### *Conclusion*

For the foregoing reasons, the judgment of the trial court is afirmed in part and reversed in part. This case is remanded to the trial court for enforcement of the trial court's judgment terminating Mother's parental rights to Ashley W. and Christian W. and for collection of costs assessed below, all pursuant to applicable law. Costs on appeal are adjudged against the Appellant, T.M.B.K.

_____
SHARON G. LEE, JUDGE