

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 2, 2017

## IN RE LUKIS B.

**Appeal from the Circuit Court for Maury County**
**Nos. 14937, 89021        David L. Allen, Judge**

---

### No. M2016-00357-COA-R3-JV

---

The father appeals the circuit court's adjudication that his child is dependent and neglected due to the father's mental illness and paranoid behavior, which make the father unfit to properly care for his child. The father contends the circuit court erred in determining that, at the time of trial, his child was dependent and neglected. Finding the evidence clearly and convincingly supports the circuit court's ruling, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which THOMAS R. FRIERSON, II, and BRANDON O. GIBSON, JJ., joined.

Shawn D. Snyder, Columbia, Tennessee, for the appellant, Lewis B.[1]

Herbert H. Slatery, Attorney General and Reporter, and Ellison M. Berryhill, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Riley Morgan Pace, Nashville, Tennessee, for the minor child, Lukis B.

## OPINION

After receiving a referral that Lewis B. ("Father") had been arrested, the Tennessee Department of Children's Services ("DCS") filed a petition in the Maury County Juvenile Court on April 16, 2013, alleging that Lukis B. (born April 2000) was

---

[1] This court has a policy of protecting the identity of children in dependency and neglect cases by initializing the last names of the parties.

dependent and neglected while in Father's care.[2] The petition alleged, *inter alia*, that Father was arrested on April 7, 2013, for simple assault against Patricia B.—Father's paramour with whom Father and the child resided—due to his erratic behavior and declarations that one of the family members was going to die that night. It further alleged that several guns were removed from the home and $8,000 and over 100 narcotic pills were found in Father's pocket at the time of his arrest. The juvenile court signed a protective custody order on the day the petition was filed, placing the minor child in the temporary custody of Patricia B. and prohibiting contact between Father and the child.

A preliminary hearing was held three days later, following which the juvenile court found probable cause to believe that Lukis was dependent and neglected and ordered temporary custody of the child to remain with Patricia B. On January 24, 2014, the juvenile court adjudicated the child dependent and neglected. That ruling was appealed by Father to the Maury County Circuit Court.

While the matter was pending de novo review before the circuit court, Patricia B. reported that she was no longer able to care for Lukis due to her ailing health. Thereafter, DCS filed a petition for temporary legal custody of the child, and on December 14, 2015, the child was committed to the care and custody of DCS.

Following a one-day trial on December 28, 2015, the circuit court ruled that DCS had proven, by clear and convincing evidence, that Lukis was dependent and neglected and suffering from neglect or abuse based upon Father's mental condition.

Father appeals, contending the evidence was insufficient to prove by clear and convincing evidence that Lukis was dependent and neglected at the time of the de novo hearing.

## ANALYSIS

A child is dependent and neglected if the "parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality, or depravity is unfit to properly care for such child," Tenn. Code Ann. § 37-1-102(b)(13)(B) (2016), or if the child "is suffering from abuse or neglect." Tenn. Code Ann. § 37-1-102(b)(13)(G) (2016). A determination that a child is dependent and neglected must be supported by clear and convincing evidence. Tenn. Code Ann. § 37-1-129 (2016). For evidence to meet the clear and convincing standard, it must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896,

---

[2] The petition also named the child's mother as a respondent; however, mother never entered an appearance, and she passed away during the pendency of the trial court proceedings.

901 n.3 (Tenn. 1992)). The evidence should produce a firm belief or conviction as to the truth of the allegations sought to be established. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007).

The General Assembly vested juvenile courts with exclusive, original jurisdiction to determine whether a child is dependent and neglected. Tenn. Code Ann. § 37-1-103(a)(1) (2011). Under Tennessee Code Annotated § 37-1-159, an appeal from the juvenile court's decision on a dependency and neglect petition is to be heard by the circuit court. Tenn. Code Ann. § 37-1-159(a) (2016). This statute directs the circuit court to "hear the testimony of witnesses and try the case de novo." *Id*. The de novo hearing requirement directs the circuit court to determine whether the child is dependent and neglected as of the time of the new hearing. *In re Caleb L.C.*, 362 S.W.3d 581, 599 (Tenn. Ct. App. 2011) (citing *Green v. Green*, No. M2007-01263-COA-R3-CV, 2009 WL 348289, at *10 n.13 (Tenn. Ct. App. Feb. 11, 2009). Accordingly, the circuit court must make a fresh determination based on the evidence presented. *Tenn. Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 289 (Tenn. Ct. App. 2006).

Our review of the trial court's determinations on questions of fact is de novo with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). Whether a child has been proven dependent and neglected by clear and convincing evidence is a question of law, which we review de novo without a presumption of correctness. *In re H.L.F.*, 297 S.W.3d 223, 233 (Tenn. Ct. App. 2009). To the extent the trial court's determinations rest upon an assessment of the credibility of witnesses, the determinations will not be overturned absent clear and convincing evidence to the contrary. *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

The circuit court heard testimony from several witnesses including Patricia B., Lukis, and Father.[3] Patricia B. testified that Father and the child had been living with her for six or seven years prior to DCS's filing of the petition. She recounted several occasions of Father's unusual behavior, including an incident that occurred in March 2013, when Father believed that his relatives, who lived in Kentucky, were driving up and down the road in front of the house and were going to kill them. Patricia B. also recounted an incident that occurred during Lukis's 2013 spring break, when Father told the child that he (Lukis) was evil, called the child "Judas," and "backhanded" the child.

Patricia B. explained that Father's paranoia worsened during the weeks leading up to his arrest. She stated that Father claimed deceased family members were after him; that

---

[3] Although there is no stenographic report or verbatim recital of the evidence, the record contains a Statement of the Evidence that was prepared by Father and approved by the circuit court. *See* Tenn. R. App. P. 24(c).

Father heard voices; that Father would periodically talk as if he were the voice of her deceased husband and say that she had killed him; and that Father believed "they" were spying on him through the microwave oven, one of Lukis's toys, and non-existent cameras in the house duct work. Patricia B. further testified that Father told Lukis he (Lukis) may be slaughtered and that Father God told him that Patricia B. would not see daylight. Patricia B. stated that Father's bizarre conduct and statements frightened the child and that she was concerned for the child's safety. Concerning Father's behavior on the day of his arrest, Patricia B. testified that Father, who had been mowing the yard, came into the house, began jumping and screaming at Patricia B. and the child, and declared that God had told him that the Lukis's uncle had abused Lukis; Lukis denied any abuse.

Lukis, who was fifteen years old at the time of the trial, testified that he had a good relationship with his father prior to Father's conduct becoming bizarre. Lukis described a time when Father said that God had told him someone at their house would die and that Lukis would get slaughtered. Lukis also recounted an occasion when Father woke him at 2:00 a.m. because Father believed they were being poisoned by the air in the house. Father made Lukis leave with him and drove Lukis around in his pickup truck for several hours with the windows rolled down because, according to Father, the air conditioner system was poisoning them. Lukis further testified regarding two occasions when Father slapped him without provocation. The first occurred while they were shopping and Lukis wanted a pair of hand warmers because it was cold. Father told Lukis the hand warmers were "of the Devil" and then slapped him. The second incident occurred when Father slapped Lukis because he fell asleep before a Taekwondo class.

Lukis testified that he became depressed and even contemplated suicide as a result of Father's conduct. Lukis shared his suicidal ideations with Patricia B., who then helped Lukis find counseling. He also stated that Patricia B. did not talk derogatorily about his father in his presence and has made no attempt to alienate him from his father. Lukis further stated that he has been given the opportunity to contact his father during the pendency of this case, but that he did not contact his father and does not want any type of contact with his father. Lukis repeatedly testified that he is afraid of his father and that Father's paranoia will result in Father harming him.

Katelyn Bojorquez, an investigator with Child Protective Services, testified that Father was a good father and had a good relationship with Lukis until late 2012 or early 2013 at which time Father became progressively paranoid and started doing "crazy" things. Specifically, Ms. Bojorquez testified that Father told her that "they" were watching the home, that Yahoo was trying to break into his computer, and that one of Lukis' toys had a camera in it, through which Father believed "they" were watching him. She also stated that Father was carrying over $8,000 cash on his person because he feared that someone was trying to get his money from the bank. Ms. Bojorquez further testified that Father believed that Patricia B. had poisoned members of her family with rat poison

and that Lukis may be slaughtered. Father also stated to Ms. Bojorquez that he was the "Son of God" and that God told him Lukis had been abused by his uncle. Lastly, Ms. Bojorquez testified that Father was hesitant and resistant to accepting DCS's services.

Dr. William Vaughn, a Senior Psychological Examiner, performed an evaluation of Father on August 19, 2013, and diagnosed Father with Anxiety Disorder. Dr. Vaughn opined that when Father is faced with intense emotional stress or pressure, he becomes reactive. As a part of that evaluation, Dr. Vaughn administered a Child Abuse Potential Inventory. Father had elevated scores in a number of areas, including the "Lie Scale," which detects individuals who distort their responses in a socially desirable manner; the "Faking-Good Index," which shows an attempt to give socially desirable responses in order to hide negative personal characteristics; and the "Abuse Scale," which identifies personal and interpersonal characteristics similar to characteristics of known child abusers. Dr. Vaughn testified that elevated abuse scores are predictive of present and future physical child abuse. Dr. Vaughn strongly recommended that Father be referred for medical stabilization of his disturbed sleep and anxiety symptoms, individual supportive counseling, parenting skills training, and family counseling. Although Dr. Vaughn did not perform a subsequent evaluation of Father, he opined that if there was no intervention in Father's life following the initial assessment, that the assessment was still accurate. On cross examination, Dr. Vaughn stated that the Parenting Stress Index may not be accurate today and that he did not know if his recommendations were still accurate. Nevertheless, Dr. Vaughn testified that the child was a risk for physical harm if in Father's care.

Judy Anderson, a Family Support Services Worker with DCS, testified that Father attended the first Child and Family Team meeting. She stated that Father agreed to the terms of the permanency plan, which included action steps for Father based on the recommendations of Dr. Vaughn. Anderson testified that Father understood the action steps yet failed to complete any of them. Ms. Anderson further testified that she offered DCS's services to Father in an effort to help him meet the action steps set forth in the permanency plan but that Father believed the contents of Dr. Vaughn's report were wrong. Ms. Anderson also explained that she repeatedly attempted to communicate with Father after their first meeting but that Father refused to communicate with her or DCS directly. Ms. Anderson stated Lukis does not want a relationship with his father. She testified that Lukis could reach out to his father but does not want to.

Lesa J., Father's paramour at the time of the trial, met Father in June 2013, and they began living together one month later. She testified that she has never observed Father talking to people or objects that were not present and that he has never threatened her or her family. According to Lesa J., Father is a loving, kind man who grieves daily for his son. She also testified that Father does not need counseling.

Father denied that he ever acted "crazy or bizarre." As to the events that led up to his arrest, Father testified that he had been called to preach and that any perception of

crazy or bizarre conduct would have been Patricia B. and Lukis's over-reaction to his call to preach. He insisted that he was "set up" by Patricia B., who he claimed was attempting to get custody of Lukis. He also alleged that Patricia B. brainwashed Lukis, and, as a consequence, Father claimed that he needed to talk to Lukis because Lukis was lying.

Father admitted that he was required to go to counseling, but he refused to do so out of fear he would lose his gun rights. Nevertheless, he testified that he was now, as of the time of trial, willing to work with DCS because he had determined that his gun rights were intact.

He went on to explain that he would do anything for his son but admitted that he has never attended counseling, made no attempt to follow the recommendations of Dr. Vaughn, and made no effort to meet any of the action steps set forth in permanency plans. He testified that the permanency plan would make him "bow down at Church" and beg for money to pay for counseling and that it was not worth swallowing his pride to go to counseling to get his son back. During his testimony, Father repeatedly testified that he was "set up" and did not like how he was being treated. He also testified that lawyers were slipping documents containing "power points" to unsuspecting judges who were signing them.

Based upon the foregoing and other evidence presented, the circuit court ruled that DCS had proven by clear and convincing evidence, both at the time of the filing of the petition and at the time of the de novo hearing on appeal, that the child was dependent and neglected. The Judgment and Order of Remand for Enforcement reads in pertinent part:

> Based upon the evidence presented at trial, the statements of counsel for the parties and the Guardian ad Litem and the Record as a whole, the Court makes the following findings: . . .
>
> [Father] was either unable to or refused to give direct answers to many of the questions asked by his counsel and other counsel.
>
> [Father] does not accept responsibility for his conduct in this case.
>
> [Father] does not accept responsibility for his losing custody of Lukis.
>
> [Father] believes that his losing custody of Lukis is the result of a conspiracy against him.
>
> The Court has reviewed and analyzed the law and the Record in this case. The case of *Green v. Green*, [No. M2007-01263-COA-R3-CV, 2009 WL

348289 (Tenn. Ct. App. Feb. 11, 2009)] is clear that the legislature dictates this Court to determine whether the child is dependent and neglected in the care of Respondent, [Father], not only at the time of the filing of the Petition in this cause, but also at the time of the hearing on appeal.

The Court does not find [Father] to be a credible witness. The Court specifically finds Lukis [B.] and Patricia [B.] to be credible witnesses.

There is no proof that [Father's] mental condition has improved since Dr. Vaughn's evaluation.

[Father] knew the action steps, but chose not to follow the action steps clearly set forth in the Permanency Plan(s).

The Court finds that based upon the proof presented, the Petitioner has met its burden of clear and convincing evidence, both at the time of the filing of the Petition and at the time of the hearing on appeal, that Lukis [B.] is a dependent and neglected child pursuant to Tennessee Code Ann. § 37-1-102(b)(12)(B) ["Whose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality, or depravity is unfit to properly care for such child"]; and (G) ["Who is suffering from abuse or neglect"].[4]

The Court further finds by clear and convincing evidence that it is in the best interest of the child, . . . that he remain in the custody of [DCS] until further orders of the Juvenile Court.

The Court would be pleased if [Father] and Lukis [B.] could re-establish a relationship. However, the re-establishing of that relationship must be accomplished under circumstances wherein Lukis [B.] feels safe and comfortable.

Therefore, at this time the child's father, [Father], shall have no contact with the child without leave of court. In order for [Father] to regain the right to visit with the minor child, he shall engage in counseling and his counselor and the child's counselor shall collaborate with one another with the goal of determining when and if it will be in the best interest of the minor child to start visiting with [Father]. Once the counselors agree that it

---

[4] At the time of the trial, the definition of a dependent and neglected child was codified at Tenn. Code Ann. § (b)(12)(A)-(J) (2014). The 2016 statute changed the numbering within this section. The definition of a dependent and neglected child is now found at Tenn. Code Ann. § (b)(13)(A)-(J) (2016).

is in the child's best interest to start visitation, then [Father] shall move the Court for visitation and arrange for both counselors to appear and testify.

As noted earlier, Father's sole issue on appeal is that the evidence is insufficient to establish that his son was dependent and neglected *as of the time of trial*. In support of his position, Father exclusively relies on the testimony of Dr. Vaughn and Lesa J. Father asserts that Dr. Vaughn's testimony indicating that the Parenting Stress Index and his recommendations may not be accurate today "highlights the uncertainty of Father's mental state at the time of the circuit court hearing and is insufficient to prove by clear and convincing evidence that the child would have been dependent and neglected in Father's care." Father further insists that Lesa J.'s testimony that Father was a loving, kind man who did not need counseling was "current evidence that spoke to the present."

We are not persuaded by Father's argument as it ignores Dr. Vaughn's statement that if there was no intervention in Father's life following the assessment, the assessment would still be accurate. In this regard, Father admitted that he had not taken any steps to comply with Dr. Vaughn's recommendations. Father also admitted that he had made no effort to meet any of the action steps in the permanency plan. Significantly, Father admitted that he had not done anything to improve his mental state or his relationship with Lukis and that it was not worth swallowing his pride to go to counseling to get his son back. Accordingly, as the trial court correctly found, there is no proof that Father's mental condition has improved since Dr. Vaughn's evaluation. Moreover, despite Lesa J.'s testimony to the contrary, the evidence clearly and convincingly proved that Father was unfit to properly care for Lukis and that Lukis would be at risk of physical harm in Father's care.

By statute, a dependent and neglected child is one whose parent, by reason of mental incapacity, is unfit to properly care for such child, *see* Tenn. Code Ann. § 37-1-102(b)(13)(B) (2016); or one who is suffering from abuse or neglect. Tenn. Code Ann. § 37-1-102(b)(13)(G) (2016). Having reviewed the record and the applicable legal standards, we find clear and convincing evidence in the record to support the circuit court's finding that Father is unfit to care for his child and that the child is suffering from abuse or neglect. Accordingly, we affirm the trial court's finding that the child is dependent and neglected.

### In Conclusion

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Father.

_____
FRANK G. CLEMENT, JR., P.J., M.S.