IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 23, 2015

## IN RE: KAILEE M.G.

**Appeal from the Juvenile Court for Sullivan County**
**No. J39837      Daniel G. Boyd, Judge**

**No. E2014-01602-COA-R3-PT-FILED-MARCH 27, 2015**

The State of Tennessee Department of Children's Services ("DCS") filed a petition in November of 2013 ("the Petition") seeking to terminate the parental rights of Kristen M.C. ("Mother") to the minor child Kailee M.G. ("the Child"). After a trial the Juvenile Court for Sullivan County ("the Juvenile Court") terminated Mother's parental rights to the Child after finding that clear and convincing evidence had been proven of grounds to terminate for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3) and that clear and convincing evidence had been proven that it was in the Child's best interest for Mother's parental rights to be terminated. Mother appeals the termination of her parental rights to the Child to this Court. We find and hold that clear and convincing evidence was proven of grounds for termination pursuant to Tenn. Code Ann. § 36-1-113(g)(3) and that clear and convincing evidence was proven that it was in the Child's best interest for Mother's parental rights to be terminated, and we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Jim R. Williams, Kingsport, Tennessee, for the appellant, Kristen M.C.

Herbert H. Slatery, III, Attorney General and Reporter, and Rebekah A. Baker, Senior Counsel for the appellee, State of Tennessee Department of Children's Services.

# OPINION

## Background

The Child was born in July of 2010, was taken into State custody on August 25, 2010, and has remained in State custody since that time. By order entered March 23, 2012 the Juvenile Court found the Child to be dependent and neglected and severely abused and relieved DCS from making reasonable efforts to reunify the Child with her parents. Specifically, the Child was found to have suffered injuries including bilateral skull fractures, acute subdural hemorrhage, and hemorrhages to all four levels of her eye.

In May of 2012 DCS filed a petition seeking to terminate the parental rights of both Mother and the Child's father, J.R.G., based upon allegations of severe abuse. That action proceeded to trial in February of 2013 in the Law Court of Sullivan County ("Law Court"). After trial the Law Court entered its final order on April 8, 2013 dismissing the petition to terminate Mother's parental rights after finding and holding, *inter alia*, that J.R.G. had severely abused the Child but that Mother had not severely abused the Child "as defined by statute either by knowingly exposing the child to or failing to protect the child from severe abuse either by her drug use or by physical injury." The April 8, 2013 order further held that DCS "is making reasonable efforts towards a permanent and appropriate goal so that the child is not in foster care unnecessarily," lifted the restraining order prohibiting Mother from having contact with the Child, and ordered that Mother was allowed supervised visitation with the Child.

In November of 2013 DCS filed the Petition seeking to terminate Mother's parental rights to the Child for substantial noncompliance with the parenting plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2) and for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3). The case proceeded to trial in June of 2014.

At trial Jeff Street the owner of Tri-Cities Diagnostics testified as an expert in the field of drug screens. Mr. Street administered several drug tests to Mother during 2013 and 2014. Mr. Street has a pharmacy degree from the University of Tennessee and had been working in his current business for approximately four and a half years at the time of trial. Mr. Street specializes in drug, alcohol, and DNA testing.

Mr. Street explained that he collects samples for testing and that Ken Potter from his office also collects samples. When asked what happens after the samples are collected, Mr. Street stated:

The sample - - sometimes we do urine, you know, urine samples. Those are tested right there, but the hair or nail samples, after we collect it, everything's sealed up. You know, a chain of custody is provided, and then it's sent on to the lab that I partner with, which is United States Drug Testing Laboratory in Des Plains, Illinois.

Mr. Street administered a urine drug test of Mother on March 25, 2013. He testified that he collected the sample and tested it immediately and that Mother tested positive for cocaine. Mr. Street explained: "[U]rine screens generally give you a detection window, about three to five days, for some drugs up to three to four weeks. A hair follicle is a little bit different because it gives you a detection period of - - goes back 90 days." Mr. Street explained:

Well, head hair - - I mean that's on an average. That 90 days comes from - - the average hair growth is about a half inch per month, and like on someone with long hair like [Mother], only the first inch and a half of the hair is actually used for testing. The rest of it is discarded. The inch and a half is closest to the scalp. So that's where that 90-day - - you know, that's an average. Some people's hair may grow a little bit faster, a little bit slower than others.

Mr. Street agreed that the results of the urine test done on March 25, 2013 would indicate that Mother had cocaine in her system sometime in the week prior to the test.

Mr. Street also did a hair follicle test on Mother on that same day, March 25, 2013, which was positive for cocaine and hydrocodone. Mr. Street explained that this test

was also positive for a benzoylecgonine. That - - when cocaine enters the body, it's broken down into what they call metabolites, and those are also tested for just to give further proof that the drug, you know, was used. And this one also was positive for benzoylecgonine. . . . [W]hen the testing is done for cocaine, it also tests for metabolites, and, again, that just gives further proof that the drug was used. . . . It just indicates the drug was used and the body is breaking - - you know, has broke it down into a metabolite, which is what, you know, your body does to get rid of the drug.

Mr. Street administered a hair follicle test on Mother on August 20, 2013, which was positive for cocaine and two metabolites, benzoylecgonine and norcaine. When asked why the previous test did not show norcaine, Mr. Street stated: "[p]robably just wasn't enough to get above the cutoff level" because the test measures so many parts per million. Mr. Street was asked what quantitation means, and he stated: "when a hair sample was

positive, that quantitation means that it was above the cutoff level. We can interpret how much or how little the drug was used, but it just means it was above the cutoff level, and so that means it was positive for that hair sample."

Mr. Street administered a hair follicle test on Mother on February 27, 2014, which was positive for cocaine, hydrocodone, and the metabolite benzoylecgonine. Mr. Street administered a hair follicle test on Mother on June 2, 2014, which was negative for all substances.

Mr. Street was asked if there was any way to show positive for cocaine other than somehow ingesting it or putting it into one's body, and he stated:

> No. There's not. And, you know, when these samples are tested for in the lab, it goes like under an initial screening to see if it's positive for anything, and then if it is positive for anything, it goes under more intensive screening to rule out any false positives. These drugs and molecules are matched up, you know, like molecule for molecule. So there's no chance of a false positive.

Mr. Street testified that "sometimes you do get false positives on urine screens," but that the hair screens were "100 percent accurate." He explained:

> Generally, [the hair sample is] taken from the back of the, the back of the head. The hair is, the hair is, you know, lifted up, and I just take about four or five little, small samples. You have to get - - it's not just one hair that's tested. It's like 150 to 200 hairs we need to test. . . . We have a hair collection envelope, sealed twice, and the person who we collect it from initials that, you know, to - - just initial it just confirming that is her hair in that envelope. Then it's put in a sample bag, sealed up for the third time. Along in that sample bag there's a - - the top part of that chain of custody is put in there. Everything has got bar codes on it.

Mr. Street testified that he does not take hair from the same area for subsequent tests. Rather, he stated: "It's random, yes."

Mother testified that she was taking Subutex before the Child was born and that she continued to take Subutex during the pregnancy. Mother stated that she was on Subutex for the first few years of the Child's life, then was off of it for about a year, and at the time of trial again was on Subutex. Mother stated she "had to wean myself off [the Subutex] because DCS had told me that it was mind altering."

-4-

Mother admitted that she used cocaine before she became pregnant with the Child and that she had a history of illegal drug use since 2004. Mother admitted that approximately twelve months prior to trial she had a relapse and used cocaine. In November of 2013 Mother was given two drug tests and she tested positive both times for cocaine. Mother denied that she had used cocaine at that time.

Mother was asked about the hair follicle drug test in August of 2013, which was positive for cocaine. Mother disputed the test results and requested another test, but her request was denied. Mother also disputed the results of the hair follicle drug test done in February of 2014 and the one done in March of 2013, both of which were positive for cocaine.

Mother was asked what prescription medications she takes, and she stated:

I take Zofran. I take Protonics for stomach ulcers. I take - - it's A-m-p-h-i-d-i-n-e, and that is for blood pressure, for low blood pressure. I don't know - - they had just given it to me at the clinic and the Subutex, and I also was prescribed Lyrica for neuropathy. . . . Oh, and I take Cymbalta.

Mother was asked about an assessment that was done which stated that Mother had a high level of awareness of her substance abuse problem. Mother was asked if this statement was accurate, and she stated: "I'm aware of it, yes." Mother admitted that she was aware of her substance abuse problem when she had her relapse. When asked if she knew that by having a relapse she was jeopardizing her relationship with the Child, Mother stated: "I didn't think of that at the moment, but I did realize that very quickly and - - I was not happy with myself, and that's exactly why I never - - I mean I've just chose not to touch it ever again."

Mother testified that her relapse occurred in October of 2013. Mother testified that she did not purchase the cocaine at that time and it was not brought to her house. Rather, Mother stated that she went to a friend's house where she did the cocaine. When asked, Mother testified that the friend was named Jennifer, but Mother stated that she did not know Jennifer's last name or address, only that Jennifer "lives over off of Sullivan Street." The Petition was filed approximately one month after Mother's admitted relapse. Mother was asked why she continued to use cocaine, and she stated:

I honestly - - the reason why I did it, I was at, you know, someone's house. It was there. I didn't think that it was even - - you know, I was - - I didn't even think it was going to be there, and I - - you know, I wasn't strong enough I guess at that time to - - you know, but I'm . . . I am very, I am very sorry for

what I've done in my past.  I am not perfect by no means.  I am not perfect.  But I know one thing - that I have tried so hard, and I have done everything that they have asked me, and this past eight months I have been clean.  I have done nothing wrong, and I have done nothing wrong to a point where I cannot take care of my child.  Yes, I have relapsed.  Yes, I have a disease, but it does not mean I don't love my child and I don't make sure that she is safe.  Actually, they have told me that I am too safe with her and I am too clean with her.

When questioned further Mother admitted that she did not dispute the hair follicle tests performed by Mr. Street which were positive for cocaine.  She stated:

That there was cocaine in my hair.  I can't attest to that because I don't know how long it stays in your hair or anything like that.  So if it was, you know, I don't know exactly how it works.  So if - - I mean I can't really dispute that, but I can dispute my urine coming out of me because I know what's coming in my body.

Mother was asked to explain why she had had some positive drug screens, and she stated:

I've relapsed.  I've messed up a couple times.  It's nothing I'm proud of.  It's nothing that, you know, is acceptable in somebody that's trying to get their child back but, you know, I'm doing the right thing and trying very hard to make everybody see that the most important thing to me is my daughter.

Mother testified that she does not associate with anyone who does drugs.  When asked about her earlier testimony about going to a friend's house to do cocaine, Mother stated: "I don't associate with anybody now that . . . .  When I relapsed I ran into a person and I ended up doing it. . . .  No, and I . . . really didn't then.  I just ran into them. . . . I don't now and I didn't before but I just ran into somebody that had been a prior friend."  Mother was asked how she defines associating, and she stated:

Because it was not other people.  It wasn't like it was a big party, it was one person. . . .  There was one person. . . .  It was a person that had the drugs through somebody that I knew previously.  It wasn't a whole bunch of people there.  It was through an acquaintance that I had known before of how I knew that person.  You asked me how I knew that person.

After further questioning, Mother admitted that the positive result of the drug test done in August of 2013 was correct.  Mother then was asked who she did cocaine with

in August of 2013 and if it was the same person she had testified about earlier, and she stated: "No, yeah, I guess . . . I don't even remember, I really don't that was a year ago."

Mother testified that she relapsed in August and October of 2013, but she denied doing drugs in February of 2014. Mother admitted that the Petition was filed in November of 2013 and that she herself had testified about how long the case had been going on, but that she continued to use cocaine. She stated: "I'm not proud of it by no means." Mother was asked if it was in the Child's best interest that Mother continued to use cocaine, and she stated: "Not that I did, and I'm not happy about it, not at all."

Elizabeth Hayward, the clinical director and chief assessor from Foundations for Life Principles, testified that she did a parenting assessment on Mother. Ms. Hayward worked with Mother to assist Mother to develop a parenting bond with the Child rather than the friendship bond that Ms. Hayward noted during the parenting assessment.

Ms. Hayward testified:

[The Child] lights up when she sees the foster mom. She runs to her. She goes to her for things. The difference is just she acts as though that's a mommy figure, and it makes sense. She lives in that home. She has lived in that home since she was five weeks old. She's almost four, and that's what me and [Mother] have talked about, and [Mother] has cried, and I probably teared [sic] up a little bit with her because at this point, the time is going to be a factor. And I've told her that every time that we've started to go to court, and she's tearing up now, and I hate it. It breaks my heart. But time, it's gone. Time has flown. This child is old enough that she knows and feels, "These are my parents. These are my brothers and sisters. This is my dog." She talks about it. She talks about Ga-Ga every visit. She talked about her dog. This is her life. Her life is very clearly established. . . . [J]ust speaking, you know, as a mental health professional, you know, the counselor side - - I hate to say it, but I honestly feel that when I've looked into this type of stuff, when I've seen it happen, it's incredibly traumatic if she were to be taken out of her home. This is just what she knows. An example is a 16-month old. The 16-month old came into a family's home as a infant and left at 16-months old back to her mother, been with her, and she's now seven. She still has contact with her foster family, sees them, and every time still cries when she leaves. She was 16-months old. [The Child's] four. The bonds are very strong.

Ms. Hayward was asked what type of effect being removed from the foster home after all this time might have on a child, and she stated:

The things that you would be looking at is oppositional defiance, acting out horrendously. The trauma factor, horrendous PTSD. I mean it's literally - - it's the same as any of us, you know. If I was removed from everybody that I've known and loved all my life, even as an adult right now if I was removed, it would be a death. Not a death of one person, a death of your entire life, all you've known. Does it mean that she doesn't love [Mother]? Of course not. But it's just a loss of everything that you've known your entire life.

Ms. Hayward was asked what Mother's interaction with the Child would be like based upon Mother's behaviors and parenting skills if the Child were removed from the foster home, and she stated:

And that's, that's a factor, too, is it would be incredibly challenging to address those type of areas because [Mother] already has some struggles with trying to provide the typical guidance of a four-year old. However, of course, this child would be incredibly and special need area for emotions, for anger, for trauma, grief. The behaviors and the emotional aspect of that, the psychological aspect would be incredibly overwhelming, incredibly hard. It would be very, very difficult for any parent, but, yeah, for [Mother] as well, of course.

Ms. Hayward expressed concern for the fact that Mother admitted "to have failed a drug screen within the last six months of a three-year battle for regaining custody . . .." She stated:

The concern that we had is if she has, if she has still struggled with substance issues after it being a three-year struggle for getting her child, it indicates that there are - - that there's a significant history, a substance history. And addiction is incredibly challenging. It's a life-long process in some ways, and if you're struggling to get to the point of sobriety, it would be incredibly hard to effectively parent soberly because you're not fully yet. You know, it takes a while to break addiction. It takes a while to be able to move through that, and then it takes a lot of support, going to groups, it takes a lot of very important support to remain that way, and it seems she's still early in the journey. . . . And what that means is she has been given - - you know, she's been given quite a bit of time to try and address the issues and trying to work through them, and basically what that states is she's created her story. She's living each chapter. She's writing each chapter, so to speak. The problem is the dates on those pages are flipping, and at this point it's been a very long time for her, a very long time for everyone. And the question is when is time

up?  And I think that's been questioned several times.  You know, how long does [the Child] hang in the balance here?  How long does [Mother] keep trying and trying?  That's a question, you know, that only the Court can answer here at this point.  How long is long enough? . . .  I know that was hard, [Mother].  I'm so sorry, and I hope I represented your strengths well.  You know I care about you deeply, and I'm going to be here for you, no matter what.  You have my number. I promise.

Ms. Hayward was asked for her recommendation, and she stated:

I feel like I've made that pretty clear.  I mean I can state it more clearly if I need to.  Do you need me to state it more clearly? . . .  Okay.  Well, I feel like, according to what I've observed, according to the full picture here, that [Mother] has great love for [the Child], sees her as her daughter. [The Child] appears very comfortable with [Mother] in many ways.  However, I do not feel that [the Child] has a parental bond and that she has established her permanency with who she's been with her entire life other than five weeks.  And that's just natural.  The recommendation is it would be psychologically damaging and very hard for her to overcome being taken out of her reality, out of her daily life, as it would be for anyone, adult, child, anyone.

Priscilla Tiffany testified that she has been the Child's DCS case manager since February of 2012.  The Child has been in the same foster home the entire time she has been in State custody.  Ms. Tiffany was asked if there was a likelihood that the conditions that exist would be remedied at an early time so that the Child could be returned to Mother's custody, and she stated: "No.  I think with her inconsistency of the drug screens, just now finding employment, I don't see it in the near future."  Ms. Tiffany stated: "we have the one negative drug screen or the hair follicle here recently.  And like I said, everything is just recently in the past couple months that she has tried to establish herself."  When asked if this showed lasting change, Ms. Tiffany stated: "I don't know in the near future.  I don't think so, but . . . ."

Ms. Tiffany was asked about the relationship between Mother and the Child, and she stated that she agreed with what Ms. Hayward had testified and further stated: "I saw it as a peer relationship.  Even now today, when we've had visits like with grandparents' visits, [the Child] gets upset where we don't go to the park.  She sees it as play time.  She just thinks she's coming to play."

Ms. Tiffany testified that each time Mother has tested negative on a drug test Mother agreed the test was valid and that each time Mother has tested positive she contested

the validity of the test.  When asked if Mother had admitted she had a drug problem, Ms. Tiffany stated: "[Mother's] always said that she's not doing drugs.  When the hair follicles come back, she said it's not true.  It's not it."

Julie B. ("Foster Mom") the Child's foster mother testified at trial.  Foster Mom is a registered nurse.  The Child was five and a half weeks old when she entered the foster home.  Foster Mom testified that she has been a foster parent for eight years and during that time has had thirteen foster children in her home, some of whom eventually were returned to their parents.  Foster Mom has five children in her home including the Child, who is the only foster child at this time.  Foster Mom testified that the Child was almost four at the time of trial, and that Foster Mom and her husband have a daughter who is five, a daughter who is nine, a son who is twelve, and a son who is fourteen.

Foster Mom testified: "[The Child had] had a head injury before she came to our home, and she required, when we first got her, seizure medication and close monitoring for seizures.  As time progressed, there were different needs."  Foster Mom was asked about what type of care the Child required, and she stated:

> Aside from the normal care of a newborn . . . she had medications.  She also had severe reflux.  So she required - - well, she had eventually medication for reflux as well.  She required a special formula to help with that reflux, but also after a feeding, she would need to be sitting up for a certain period of time to reduce the risk of gastric reflux.  And also because of the nature of her injuries, we got her evaluated by Tennessee Early Intervention Services at about two months old, and they began to come in, . . . .  And they also began working with her, and so because of that, they then referred her for occupational therapy and speech therapy.  So she has had therapy services.  She also had vision problems and was seeing a doctor for her vision issues.  She saw a gastroenterologist not only for the reflux, but also because she had tested positive of Hepatitis C at birth, that they wanted to watch and see if it zero converted to negative, which it did.  And she has also had speech therapy in that time.  I did say that Early Intervention Services which were weekly, and we, as a result of participating with the occupational therapy and the Early Intervention Services, have done many therapies with her, continued therapy, strengthening, massage therapies, Wilbarger brushing, things to help stimulate her growth and development to, you know, try to counterbalance some of the potentials that could have been there from her injuries.

Foster Mom explained:

> Well, the Wilbarger brushing . . . is where you take a soft brush and you brush the arms and the back and the legs, and then you do joint compression, and you do that anywhere from six to ten times a day in order to help the brain connect with the nerves and be able to communicate correctly with the nerves, and I've done it with other children as well, not just [the Child]. But one of the things with development and the whole sensory system is making sure that the brain and the nerves work together. And like I said, we would do that anywhere from six to ten times a day early on, and it helps with speech and language development, feeding, physical development. And also she was - - she had some tightness in her muscles, and we did a lot of massage in addition to just the normal everyday things that you do to stimulate a child to help them develop correctly.

Foster Mom was asked how many hours a day she spent with the Child, and she stated: "Well, until she went to school, practically all day every day. . . . It's an ongoing thing that you do throughout the day, you know."

> Foster Mom was asked how often the Child sees specialists, and she stated:

> She see Dr. Trainer, which is the physiatrist in Knoxville, every six months now, I think, and she sees occupational therapy every other week. And when she's in school, she gets weekly speech and occupational therapy because she is in a special class at the Palmer Center. When she aged out of Early Intervention, they tested her, and she showed significant delay to need additional services through the state. . . . [A]t one time she had occupational therapy weekly, speech therapy, and I know she was evaluated for physical therapy. She had very limited physical therapy because gross motor movements were not as important as the fine motor movements for her and her needs.

> Foster Mom testified that the Child's expenses exceed the amount of money that she and her husband receive for being the Child's foster parents. Foster Mom and her husband pay for the extra expenses themselves and do not seek reimbursement from the State for those costs. Foster Mom testified that she and her husband are in a position to financially afford these expenses.

Foster Mom was asked how the Child was doing currently, and she stated:

> She's doing very well. She's a happy, very loving child, very playful. She is delayed with her speech, although that has improved a tremendous amount since she started going to Palmer Center. They even commented at her IEP meeting that - - her teacher said that in all her years of teaching she had never had a student that was able - - and I can't remember exactly the test, but that had scored a perfect score on that test in that year, you know, in that short amount of time. She's an extremely intelligent little girl. She just struggles to express, and now it's more of struggles to be understood because she is getting more words, and she is using more sentences. You kind of have to know her to know what she's saying, though.

Foster Mom also stated: "She has very, very low vision in her right eye, and Dr. Seaton has told me it's not really functional vision. So she struggles with depth perception. And if there are new, new surfaces that change, she may trip." Foster Mom testified:

> She did knock her tooth out in 2012 at school. I had just dropped her off at school. I was in the hallway with her, and she was walking down the hall and dragged her right foot, which is the - - well, I don't know if it was her right or her left. She dragged one of her feet and tripped right in front of me. I could not get there. And because her reflexes are slower - - they're getting better, but because they were slower, she couldn't get her hands out. And that was December 5th, 2012, and her - - she went down on her hands, but her head also went down, and her tooth hit the floor. Her mouth hit the floor. Did she [sic] not have any outer damage, but it knocked the tooth out, and so she did receive treatment for that.

The tooth that was knocked out was a baby tooth.

Foster Mom was asked how the Child got along with the other children in the household, and she stated: "She loves them dearly, particularly the five-year old. She is incredibly bonded with her. She talks about her all the time. When one of them is not with the other, they want to know where the other person is and when they're going to come back." Foster Mom and her husband adopted the five year old who was a foster child in their household when the Child first entered their home. She stated: "I don't know that the five-year old understands that [the Child] is a foster child. I don't know that she - - she's not old enough to understand that. She just thinks she's her sister." Foster Mom testified that the Child goes on family vacations with the rest of the family.

Foster Mom was asked what her relationship with the Child was like, and she stated:

She is very close to both me and my husband but particularly to me. She looks to me for guidance. She looks to me for comfort if she's sad or hurting, and she asks where I am if I'm gone. For example, this morning my husband was going to take everyone and go and pick up one of my other children from a camp that he was attending, and I obviously was not dressed for that, and she said, "Mama come?", and I said, "No. Mama has a meeting," and she said, "I miss you, Mama." So she's very, very concerned about me and where I am and wants to be around me a lot.

Foster Mom testified that she and the other members of her family love the Child. When asked what life would be like if the Child were not in her home, Foster Mom stated: "Very empty. I think it would be devastating for her and for my children."

After trial the Juvenile Court entered its detailed Final Decree of Guardianship order on July 25, 2014 terminating Mother's parental rights to the Child after finding and holding, *inter alia*:

The Court finds that the State of Tennessee, Department of Children's Services has proven by clear and convincing evidence grounds for termination of parental rights based upon the following findings of fact.

* * *

3. The State of Tennessee Department Of [sic] Children's Services is the current custodian and partial guardian of the child. The Sullivan County Juvenile Court adjudicated the child dependent and neglected on January 20th 2012 after issuing an emergency protective custody order placing the child in temporary state custody on August 25th 2010. The child has been in foster continuously since the Juvenile Court's protective custody order.
4. [The Child] was born to [Mother] and [J.R.G.] on July 16th 2010 in Sullivan County[,] Tennessee.

* * *

6. [J.R.G.] is not a party to this action as his parental rights were previously terminated on [sic] by final order of the Circuit Court of Sullivan County [in April of 2013].

## GROUND 2
## PERSISTENT CONDITIONS

16.     The child has been removed from the home by order of the Court for a period well over six months and is now approaching 4 years.

17.     In February 2013 DCS was ordered to again use reasonable efforts to reunify the child with the Mother, after having been relieved of the same by order of the Court on January 20th 2012.

18.     In February 2013 DCS, with the assistance of the Respondent Mother, created a permanency plan and a requirement of that plan was that [Mother] would submit to and pass random drug screens.

19.     On March 18th 2013 Respondent Mother failed a drug screen for cocaine as shown in Collective Exhibit 1; Exhibit 2; and Collective Exhibit 5.

20.     On March 25th 2013 Respondent Mother failed a urine drug screen performed by Jeff Street at Tri-Cities Diagnostics for cocaine.

21.     On March 25th 2013 a hair follicle sample was obtained and tested by Jeff Street at Tri-Cities Diagnostics which was positive for cocaine and opiates.

22.     On April 29th 2013 [Mother] was asked to take a drug screen and was unable to produce a specimen.  On page 18 of the permanency plan it states that [Mother] will participate in random drug screens and if she refuses the screen will count as a positive.  Therefore this Court finds the results of that screen to be a positive result due to her failure to produce a specimen.

23.     On August 20th 2013 [Mother] failed a hair follicle drug screen for cocaine.

24.     In November 2013 [Mother] was administered a drug screen at DCS which showed a positive result for cocaine; [Mother] disputed the results and another test was given by a different DCS employee, and that test showed the same results for cocaine.

25.     On December 10th 2013 [Mother] was administered a drug screen at DCS which was positive for cocaine; again [Mother] disputed the results and she went to Holston Valley Hospital for testing which showed a negative result for all substances.  The Court finds those results to not be accurate pursuant to [Mother's] testimony that she did not go immediately to the Hospital, rather she went to dinner and engaged in a few other activities before subsequent testing.

26.     On February 27th 2014 [Mother] was administered a hair follicle drug screen which was positive for cocaine and opiates.

27.     [Mother] has on at least two occasions engaged in drug rehabilitation and is currently using Buprenorphine by prescription for the second time since this case began and most recently since March 2014.

28.     [Mother] has had an ongoing drug problem with cocaine and continued to use the drug even while this termination proceeding was pending, thus showing little likelihood that the condition will be remedied in a timely manner.

29.     Continuation of the parent/child relationship greatly diminishes the child's chances of being placed into a safe, stable and permanent home due to the Mother's history of narcotic abuse.

30.     The Department has exercised reasonable efforts in this case prior to being relieved of the same and again after the Order reinstating the use of reasonable efforts by: Providing [Mother] with an Alcohol and Drug Assessment; Parenting Assessment; Random drug screens; regular visitation; notifying her of all medical and school appointments for the child; attempted home visits to inspect her home; notifying her of all meetings, foster care review boards, and court hearings; attempts to confirm reported sporadic employment;

**BEST INTEREST**

The Court finds that the State of Tennessee, Department of Children's Services has proven by clear and convincing evidence that termination of parental rights is in the best interest of the children [sic] based upon the following findings of fact.

31.     The chance that the relationship between Mother and Child could ever be reconnected is very slim, and at this point would not be in the child's best interest.

32.     It is in the child's best interests for termination to be granted, because [Mother] has not made changes in her conduct or circumstances that would make it safe for the child to go home.

33.     It is in the child's best interests for termination to be granted, because [Mother] has not made lasting changes in her lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible.

34.     It is in the child's best interests for termination to be granted, because there is no meaningful relationship between the child and [Mother] as the Court credits the testimony of Elizabeth Hayward when asked by the Court if the Mother/Child relationship could be reestablished to which she said that it was not possible, that it was beyond the point of no return.

35. It is in the child's best interests for termination to be granted, because changing caregivers at this stage of her [sic] will have a detrimental effect on her.

36. It is in the child's best interests for termination to be granted, because [Mother] abuses drugs rendering her consistently unable to care for the child in a safe and stable manner.

37. It is in the child's best interests for termination to be granted, because the child has established a strong bond with her foster parents, who wish to adopt her.

**CONCLUSIONS OF LAW**

* * *

**GROUND 2**

**PERSISTENT CONDITIONS**

39. In accordance with T.C.A. §§ 36-1-113(g)(3) the child has been removed from the [Mother's] home for over six months and the conditions that led to the removal continue to persist, and new conditions exist that in all reasonable probability would cause the child to be subjected to further abuse or neglect and therefore prevent the safe return of the child to [Mother] and there is little likelihood that those conditions will be remedied at an early date to allow the child to be returned to her in the near future; and that continuation of the parent child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Thus the Court finds that the Tennessee Department of Children's Services has proven by clear and convincing evidence that grounds for termination of parental rights exists and has proven by clear and convincing evidence that it is in the best interest of the child that all the parental rights of [Mother] to said child be forever terminated; and therefore the complete custody, control, and guardianship of said child be awarded to the State of Tennessee, Department of Children's Services, with the right to place said child for adoption and to consent to said adoption in loco parentis.

Mother appeals the termination of her parental rights to the Child to this Court.

**Discussion**

Although not stated exactly as such, Mother raises four issues on appeal: 1) whether the Juvenile Court erred in denying Mother's motion to dismiss; 2) whether the Juvenile Court erred in finding that DCS exercised reasonable efforts; 3) whether the Juvenile Court erred in finding that grounds had been proven by clear and convincing evidence to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3) for persistent conditions; and, 4) whether the Juvenile Court erred in finding that it was in the Child's best interest for Mother's parental rights to be terminated.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

> Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or

-17-

guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We first consider whether the Juvenile Court erred in denying Mother's motion to dismiss. Mother filed a motion to dismiss alleging that the Petition should be barred by *res judicata* or *collateral estoppel* because the petition for termination based upon allegations of severe abuse filed by DCS in 2012 had been dismissed as to Mother. The allegations in the Petition, however, are based upon the grounds of substantial noncompliance with the parenting plan[1] and persistent conditions, two grounds which were not included in the previous petition to terminate. Furthermore, the evidence used to prove the ground of persistent conditions included evidence of drug tests that Mother failed well after the filing of the May 2012 petition seeking to terminate for severe abuse. As such, the previous petition could not operate as *res judicata* upon the issues involved in the Petition. To hold, as Mother requests, that a petition to terminate parental rights once defeated operates as a bar to all future such petitions to terminate that parent's parental rights would be ludicrous, and we expressly decline to so hold. This issue is without merit.

We next consider whether the Juvenile Court erred in finding that DCS exercised reasonable efforts. Our Supreme Court recently held:

For these reasons, we hold that, in a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of

---

[1]The Juvenile Court found and held that DCS did not prove this ground. This finding was not appealed. As such, we will not discuss the ground of failure to comply with the parenting plan in this Opinion.

-18-

the parental rights of the respondent parent. As with other factual findings made in connection with the best-interest analysis, reasonable efforts must be proven by a preponderance of the evidence, not by clear and convincing evidence. *In re Audrey S.*, 182 S.W.3d at 861. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest. *See In re Adoption of Kleshinski*, No. M2004-00986-COA-R3-CV, 2005 Tenn. App. LEXIS 275, 2005 WL 1046796, at *17 (Tenn. Ct. App. May 4, 2005) (citing *In re M.J.B.*,140 S.W.3d 643, 654 (Tenn. Ct. App. 2004)); *see also In re Giorgianna H.*, 205 S.W.3d at 516; *Tenn. Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 288 (Tenn. Ct. App. 2006).

*In re: Kaliyah S.*, ___ S.W.3d ___ , No. E2013-01352-SC-R11-PT, 2015 Tenn. LEXIS 14, at *57 (Tenn. Jan. 22, 2015).

With regard to reasonable efforts the Juvenile Court specifically found and held:

The Department has exercised reasonable efforts in this case prior to being relieved of the same and again after the Order reinstating the use of reasonable efforts by: Providing [Mother] with an Alcohol and Drug Assessment; Parenting Assessment; Random drug screens; regular visitation; notifying her of all medical and school appointments for the child; attempted home visits to inspect her home; notifying her of all meetings, foster care review boards, and court hearings; attempts to confirm reported sporadic employment;

The evidence in the record on appeal does not preponderate against these findings, and we find no error in the Juvenile Court's consideration of this factor along with all of the other relevant factors in determining what was in the best interest of the Child. This issue is without merit.

Next, we consider whether the Juvenile Court erred in finding that grounds had been proven by clear and convincing evidence to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3) for persistent conditions. As pertinent, Tenn. Code Ann. § 36-1-113(g)(3) provides:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

-19-

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the a [sic] parent or parents or a guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the a [sic] parent or parents or a guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3) (2014). With regard to this ground the Juvenile Court specifically found:

16. The child has been removed from the home by order of the Court for a period well over six months and is now approaching 4 years.

17. In February 2013 DCS was ordered to again use reasonable efforts to reunify the child with the Mother, after having been relieved of the same by order of the Court on January 20th 2012.

18. In February 2013 DCS, with the assistance of the Respondent Mother, created a permanency plan and a requirement of that plan was that [Mother] would submit to and pass random drug screens.

19. On March 18th 2013 Respondent Mother failed a drug screen for cocaine as shown in Collective Exhibit 1; Exhibit 2; and Collective Exhibit 5.

20. On March 25th 2013 Respondent Mother failed a urine drug screen performed by Jeff Street at Tri-Cities Diagnostics for cocaine.

21. On March 25th 2013 a hair follicle sample was obtained and tested by Jeff Street at Tri-Cities Diagnostics which was positive for cocaine and opiates.

22. On April 29th 2013 [Mother] was asked to take a drug screen and was unable to produce a specimen. On page 18 of the permanency plan it states that [Mother] will participate in random drug screens and if she refuses the screen will count as a positive. Therefore this Court finds the results of that screen to be a positive result due to her failure to produce a specimen.

23. On August 20th 2013 [Mother] failed a hair follicle drug screen for cocaine.

24. In November 2013 [Mother] was administered a drug screen at DCS which showed a positive result for cocaine; [Mother] disputed the results and another test was given by a different DCS employee, and that test showed the same results for cocaine.

25. On December 10th 2013 [Mother] was administered a drug screen at DCS which was positive for cocaine; again [Mother] disputed the results and she went to Holston Valley Hospital for testing which showed a negative result for all substances. The Court finds those results to not be accurate pursuant to [Mother's] testimony that she did not go immediately to the Hospital, rather she went to dinner and engaged in a few other activities before subsequent testing.

26. On February 27th 2014 [Mother] was administered a hair follicle drug screen which was positive for cocaine and opiates.

27. [Mother] has on at least two occasions engaged in drug rehabilitation and is currently using Buprenorphine by prescription for the second time since this case began and most recently since March 2014.

28. [Mother] has had an ongoing drug problem with cocaine and continued to use the drug even while this termination proceeding was pending, thus showing little likelihood that the condition will be remedied in a timely manner.

29. Continuation of the parent/child relationship greatly diminishes the child's chances of being placed into a safe, stable and permanent home due to the Mother's history of narcotic abuse.

The evidence in the record on appeal as discussed fully above does not preponderate against these findings made by the Juvenile Court by clear and convincing evidence. The evidence shows that Mother continued to choose to use cocaine even after the filing of the Petition and continued to dispute the positive drug screens which showed such use. Mother's own testimony established that after the Child had been in State custody for years Mother "just ran into somebody that had been a prior friend," and Mother made a conscious choice to go to that person's home to use cocaine. Yet Mother insisted that she did not use drugs and that she did not associate with people who use drugs. We find no error in the Juvenile Court's finding that clear and convincing evidence was proven of grounds to terminate for persistent conditions due to Mother's continued drug use.

Finally, we consider whether the Juvenile Court erred in finding that it was in the Child's best interest for Mother's parental rights to be terminated. When considering whether termination is in a child's best interest, a court is to consider the non-exclusive list of factors contained in Tenn. Code Ann. § 36-1-113(i). Our careful and thorough review of the record on appeal reveals that the Juvenile Court did consider the relevant factors when making its determination that clear and convincing evidence existed that it was in the Child's best interest for Mother's parental rights to be terminated. We need not reiterate the Juvenile Court's detailed findings as they are quoted fully above. The evidence in the record on

appeal does not preponderate against the Juvenile Court's findings made by clear and convincing evidence relevant to this issue.

As grounds for termination were proven by clear and convincing evidence and it was shown by clear and convincing evidence that the termination of Mother's parental rights was in the Child's best interest, we affirm the Juvenile Court's July 25, 2014 order terminating Mother's parental rights to the Child.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellant, Kristen M.C.

_____
D. MICHAEL SWINEY, JUDGE