IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 1, 2020

## IN RE BROOKLYN R.

**Appeal from the Juvenile Court for White County**
**No. JV-1493, JV-4702      Sam Benningfield, Judge**
_____

**No. M2020-00596-COA-R3-PT**
_____

The Tennessee Department of Children's Services filed a petition to terminate a father's parental rights based on abandonment by failure to support; abandonment by failure to visit; abandonment by wanton disregard; substantial noncompliance with permanency plans; and failure to manifest an ability and willingness to assume custody of the child. The trial court granted the petition, finding that the Department proved the alleged grounds by clear and convincing evidence and that terminating the father's parental rights was in the best interests of the child. The father appeals the trial court's conclusion that terminating his parental rights is in the best interests of the child. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;
Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

J. Patrick Hayes, Cookeville, Tennessee, for the appellant, Darrell R.

Herbert H. Slatery III, Attorney General and Reporter; and Erica M. Haber, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

## BACKGROUND

Brooklyn R. (the "Child") was born on May 21, 2018, to unmarried parents Darrell R. ("Father") and Tabitha D. ("Mother"). Two days later, on May 23, 2018, the Tennessee Department of Children's Services ("DCS" or "the Department") filed in the White County

Juvenile Court ("the trial court") a Petition to Declare the Child Dependent and Neglected and for Emergency Temporary Legal Custody, alleging that the Child tested positive for Oxycodone at birth, that Mother admitted taking Oxycodone without a prescription during pregnancy, that Father tested positive for Oxycodone the day after the Child's birth and did not provide a prescription for the drug, that parents had no stable housing, and that extended family members were unable to take care of the Child. On the same day, the trial court entered a protective custody order placing the Child in DCS custody and appointing a guardian ad litem for the Child.

On May 30, 2018, the trial court held a preliminary hearing on the petition and ordered that the Child remain in DCS custody, finding that the Department had shown probable cause that removal of the Child from her parents' custody was required.[1] On June 18, 2018, the trial court ratified the first family permanency plan developed by DCS,[2] finding the plan's requirements to be reasonable, related to remedying the conditions that necessitated foster care, and in the best interest of the Child. The permanency plan listed as goals "Return to Parent" and "Adoption." On June 19, 2018, Father signed an acknowledgement form indicating he had received the Criteria and Procedures for Termination of Parental Rights with the permanency plan.

On August 6, 2018, the trial court heard the Department's petition. The trial court found that DCS had proven by clear and convincing evidence that the Child was dependent and neglected as to Mother only and ordered that the Child remain in DCS custody. The trial court's order noted the parents' extensive history of losing custody of their children due, at least in part, to substance abuse, homelessness, and drug exposure.[3] The same issues—lack of stable housing and drug exposure—applied to the Child's case.

At a review hearing in November 2018, DCS reported that the Child was doing well after being placed in foster care with a relative in Morristown and that her parents had not completed the steps in the permanency plan. Following hearings in January, April, May, and August 2019, the trial court found that Father and Mother had not completed any of the permanency plan tasks and ordered that the Child remain in foster care with maternal great aunt, Kimberly E., in Morristown, Tennessee. On December 3, 2019, the trial court entered an Agreed Order in which Father stipulated that the Child was dependent and neglected and should remain in DCS custody. This was the final disposition with respect

---

[1] "A child taken into custody shall not be detained or placed in shelter care prior to the hearing on the petition unless there is probable cause to believe that the child . . . [i]s a neglected, dependent or abused child, and . . . the child's detention or shelter care is required because the child is subject to an immediate threat to the child's health or safety . . . ." Tenn. Code Ann. § 37-1-114(a)(2).

[2] This first permanency plan was developed by DCS on June 7, 2018. The trial court later ratified plans developed by the Department on November 30, 2018; May 15, 2019; and November 20, 2019.

[3] Father had previously lost custody of six children: two that he and Mother shared and four others. Mother had independently lost custody of another child.

to the dependency and neglect proceedings initiated by the Department shortly after the Child's birth. At a review hearing on December 16, 2019, the trial court found that the Child's parents had failed to complete any of the permanency plan's requirements.

Meanwhile, on April 11, 2019, DCS had filed a petition seeking to terminate the parental rights of Mother[4] and Father. The Department alleged five grounds for terminating Father's parental rights: (1) abandonment by incarcerated parent for failure to support; (2) abandonment by failure to visit; (3) abandonment by wanton disregard; (4) substantial noncompliance with permanency plan; and (5) failure to manifest an ability and willingness to assume custody. At the time the petition was filed, Father had been incarcerated continuously since January 5, 2019.[5] Specifically, the Department alleged that Father had failed to provide support for the Child while in DCS custody; had visited the Child only once during the four months preceding his incarceration; had engaged in "the performance of criminal acts"; and had shown "indifference to the consequences of said acts for the child, namely incarceration, which rendered him absent from the child's life and compromised his ability to parent." The Department further alleged that Father had "not substantially complied with the provisions of the permanency plans" which required, among other things, for Father to be drug-free and to refrain from any illegal activity. Last, the petition alleged that Father had failed to show an ability or willingness to assume custody or financial responsibility for the Child and that returning custody to Father would "pose a risk of substantial harm to the physical or psychological welfare of the child." Father received notice of the petition at the Bledsoe County Correctional Facility, and the trial court appointed counsel for Father.

The trial court heard the petition for termination on January 10, 2020. At the outset, DCS introduced into evidence over one hundred exhibits, including certified copies of juvenile court adjudicatory orders and permanency plans related to other children of Father, as well as judgments and other records related to Father's extensive criminal history. The Department called as witnesses Michelle Hagarty, a caseworker assigned to the Child's case, and Ms. E., the Child's foster mother. Father, who had been transported from the detention facility in Bledsoe County to attend the hearing, testified as his only witness.

Ms. Hagarty testified that part of her role in the case was assisting Father and Mother to reunify with the Child. She explained that the Child was placed in DCS custody two days after birth after testing positive for Oxycodone due to Mother's use of the drug during pregnancy. Ms. Hagarty stated that the Child has remained in foster care continuously since being placed in DCS custody. Concerning the allegation that Father had failed to provide support, Ms. Hagarty stated that Father did not pay child support or provide any other type of support to the Child at any point before his incarceration. She confirmed that

---

[4] Because Mother is not a party to this appeal, we will reference her only when necessary.
[5] Father was also incarcerated from March 4, 2018 to August 21, 2018.

DCS's permanency plans given to Father specified his duty to pay child support. As to abandonment by failure to visit, Ms. Hagarty said that Father's only visit to the Child while in foster care took place on Christmas Day 2018. She noted that Father knew how to schedule visits with and had contact information for the Child's foster parents. Ms. Hagarty also stated that Father did not complain of difficulty visiting the Child and that he was aware that she could assist him with finding transportation. Ms. Hagarty acknowledged that Father wrote a letter to the Child in October 2019. Ms. Hagarty stated that the duty to visit is discussed in the permanency plan for which Father had signed an acknowledgment receipt. With respect to abandonment by wanton disregard, Ms. Hagarty testified that Father's criminal conduct during the four months immediately preceding the filing of the petition to terminate his parental rights shows "a selfishness, a need to not be there for the child, . . . and it's just a disregard for the child itself, the safety of the child, and the permanency of the child." She also said that Father had not established a suitable home for the Child.

Concerning the ground of substantial non-compliance with the permanency plan, Ms. Hagarty first explained that during the period of time that the Child had been in DCS custody, the Department had developed four different permanency plans that were ratified by the trial court. She stated that Father did not complete any of the tasks outlined in the November 30, 2018 permanency plan—the plan in effect when the petition was filed in April 2019. Ms. Hagarty added that Father had received copies of the permanency plan and never indicated that he could not complete the prescribed tasks. In her view, it was very unlikely that Father would complete the plan's tasks in the future because of his history of incarceration and failure to work towards completing tasks in any of the plans. Ms. Hagarty noted that prior to the Child's case, Father did not complete permanency plan tasks for regaining custody of several other children. She also said that DCS's efforts to assist Father with plan's tasks were thwarted by his failure to maintain contact.

Ms. Hagarty testified that Father failed to manifest an ability to assume custody of the Child because Father was in jail consistently; did not provide support, permanent housing, or parenting; and visited the Child only once. She noted that Father has multiple other children with whom he has no contact. Ms. Hagarty said that Father's lack of visitation and support, especially with the foster parents' open-door policy, showed an unwillingness to assume custody of the Child. In addition, Ms. Hagarty believed that placement with Father would pose a risk of harm to the Child. She discussed the lack of permanency, adequate housing, and financial stability for the Child—concerns not present at the foster home—as well as Father's repeated incarcerations. Ms. Hagarty also observed that the Child is currently fostered with her two siblings and "taking her away from that . . . would be detrimental to her." Ms. Hagarty added that the foster parents wish to adopt the Child and are the permanent guardians of her siblings.

As to best interests of the Child, Ms. Hagarty stated that Father has not made it safe

- 4 -

for the Child to be home with him or made a lasting adjustment after reasonable efforts by DCS, because he is currently incarcerated and after release would be in a halfway house for at least six months. Based on Father's criminal history, she does not believe he will be able to complete his parole requirements upon release. Ms. Hagarty believes the Child and Father do not have a meaningful relationship. To her knowledge, Father has "laid eyes" on the Child once. She indicated that a change in caretaker and physical environment—where the Child currently has siblings, love, protection, security, and permanency—would negatively affect the Child. Ms. Hagarty testified that Father's unstable mental and emotional status, reflected by his constant arrests and incarcerations and his transient lifestyle, prevents him from providing stability for the Child. She also noted that Father has no emotional or mental attachment to the Child, having seeing the Child only once. To her, the best place for permanency is with the foster parents where the Child has love, support, and her two siblings.

Ms. Hagarty testified about efforts by DCS to assist Father with completing the permanency plan. She indicated she personally reviewed the requirements of the permanency plan with Father and told Father to provide her with any information about steps he had taken toward completing the permanency plans, but that Father provided no such information. Ms. Hagarty said that she spoke with and visited Father while he was incarcerated.

Ms. E., the Child's foster mother, explained that Mother is her great niece and that the Child has lived with her since the Child was a few days old. Her fiancé, Frank G., and two of the Child's siblings also live with Ms. E. The three siblings have bonded with each other. Ms. E. stated she is ready, willing, and able to adopt the Child. She stated that Father had her contact information and that he could call any time to visit. Ms. E. corroborated that Father visited the Child on Christmas 2018. She stated that Father brought some things for the Child at that time; he "tried to play with her, . . . loved on her and all that, but, I mean, she was, she was just a baby, so, you know, she didn't take to nobody but me and Frank, so." Ms. E. observed that there was no bond between Child and Father at that time. She said that Father visited the Child more than once—three to four times during the time period she had fostered the Child—and explained that Father would come by himself and bring "little tokens" for the Child. Ms. E. thought that the Child would be "devastated" if taken from her home because they "bonded so well . . . from day one" and this is the only consistent home the Child has ever known.

Father testified about his support for the Child. He stated he "didn't do a whole lot" but gave the Child baby "stuff" such as toys, pacifiers, and bottles. At one point during his testimony, Father indicated that he did not work before incarceration and that he had filed for disability in 2014 because of a neck injury. However, he also stated that he had worked with his family's construction business, his own construction company, and as a truck driver and drywall hanger before incarceration. Father also said he now works at the

Bledsoe County Correctional Facility's farm and that he did not send money to the Child while incarcerated because he has been paying tickets. Concerning visitation, Father said he last visited the Child a few days after Christmas 2018. He testified that before going to prison he had no permanent home, explaining that he "travel[ed] around quite a bit . . . [and] would either stay at my uncle's house or a motel close to where it was at that I was trying to help somebody work." Father said that he lived in Lebanon, Tennessee, during the four months immediately preceding his incarceration. According to Father, Lebanon is about 167 miles from the foster home in Morristown, but he drove without a driver's license a few times to see the Child. With respect to the criminal conduct that resulted in his incarceration, Father admitted to being charged with theft "three or four" times after the Child was born, but he stated that most of the charges in his criminal record were from 1991 through 1993. Father said he has completed parole requirements twice but admitted that he has never been able to complete a probationary period. Although Father asserted he would be out on parole in March 2020, he conceded that his sentence will extend to April 2022 if parole is denied. He did not present any evidence showing that he would be released on parole. Father stated that upon release, he would have to go to a family's residence for ninety days before being able to get his own place. While in prison, he has participated in the Cognitive Intervention Program for mental stress and substance abuse issues. Father said he desires to get a good job and have his children home after his release, but he admitted he has no home for the Child after release and that he will be responsible for paying a $3,000 restitution judgment.

Father admitted he did not work on the permanency plan tasks before incarceration, stating that he "didn't really think [he] had a problem with [Oxycodone], because it was the medication I was prescribed [for his neck injury]." The record contains no evidence corroborating that he suffered a neck injury or was prescribed Oxycodone. Father claimed that he completed a mental and drug evaluation, as required by the permanency plan, but introduced no evidence to support his claim. He conceded he has not regained custody of his other six children because he chose not to complete their respective permanency plans. Rather, he stated, "it's all because your wife fails a drug test, because you can't control her problems, and then you're still the one that gets voted out because of it." Father testified that the Child probably does not know him as her father. He praised Ms. E.'s role as a foster parent, stating that he does not have to worry about his children being taken care of. Father said he wants to regain custody of his children but also wants them to keep their bond with the foster family.

On March 16, 2020, the trial court entered an order terminating Father's parental rights. The trial court stated that it found Ms. Hagarty and Ms. E. to be competent and credible and that their testimony had not been impeached in any regard. Consequently, it resolved against Father issues where his testimony contradicted that of Ms. Hagarty and Ms. E. The trial court found that DCS proved by clear and convincing evidence the grounds of abandonment by failure to support "for the aggregated four (4) month period

immediately preceding his incarceration"; abandonment by failure to "engage in more than token visitation during the aggregated four (4) month period preceding incarceration"; and abandonment "by engaging in conduct prior to incarceration that exhibited a wanton disregard for the welfare of the child." In addition, the trial court found that Father had "not substantially complied with the provision of the permanency plans" and "failed to manifest, by act or omission, a willingness and ability to personally assume legal and physical custody or financial responsibility of the child." Applying the statutory factors, the trial court concluded that it was in the best interests of the Child to terminate Father's parental rights. In that regard, the trial court noted that the more permanent place for the Child is with the foster parents, who have a substantial relationship with the Child and are willing to adopt her. Father timely filed a Notice of Appeal.

## ISSUE PRESENTED

The only issue raised by Father is whether the trial court erred in determining that it was in the best interests of the Child to terminate his parental rights.

## STANDARD OF REVIEW

Our Supreme Court has explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors....' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016). Tennessee Code Annotated section 36-1-113 provides the various grounds for termination of parental rights. *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013); *see also* Tenn. Code Ann. § 36-1-113(g). "A party seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best

interest." *Id.* (citing Tenn. Code Ann. § 36-1-113(c)).

In light of the substantial interests at stake in termination proceedings, the heightened standard of clear and convincing evidence applies. *In re Carrington H.*, 483 S.W.3d at 522 (citing *Santosky*, 455 U.S. at 769). This heightened burden "minimizes the risk of erroneous governmental interference with fundamental parental rights[,]" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *Id.* (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). Accordingly, the standard of review in termination of parental rights cases is as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.,* 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.,* 319 S.W.3d at 596–97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 523–24.

We give considerable deference to a trial court's findings about witness credibility and the weight of oral testimony, as the trial court had the opportunity to see and hear the witnesses. *State Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 288 (Tenn. Ct. App. 2006). Where an issue "hinges on the credibility of witnesses, the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings." *Id.* (citing *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1990)); *see also Franklin*

*Cnty. Bd. of Educ. v. Crabtree*, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010) ("If the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary.").

## DISCUSSION

In order to terminate parental rights, a trial court must find by clear and convincing evidence that: (1) the statutory grounds for termination of parental and guardianship rights have been established, and (2) termination is in the best interests of the child. *See* Tenn. Code Ann. § 36-1-113(c). Although Father does not challenge the statutory grounds for termination relied upon by the trial court, this Court "must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525–26. Thus, we begin our analysis by reviewing whether the proof presented at trial constitutes clear and convincing evidence of each ground for termination listed in the trial court's Final Order.

## I. Grounds for termination

Tennessee Code Annotated section 36-1-113(g) lists abandonment, as defined in section 36-1-102, as a ground for terminating parental rights. Tenn. Code Ann. § 36-1-113(g)(1) (2017 & Supp. 2019). Section 36-1-102 provides that abandonment occurs, among other instances, when

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, *and* either has failed to visit or has failed to support or has failed to make reasonable payments toward the support of the child *for four (4) consecutive months immediately preceding such parent's or guardian's incarceration*, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. If the four-month period immediately preceding the institution of the action or the four-month period immediately preceding such parent's incarceration is interrupted by a period or periods of incarceration, and there are not four (4) consecutive months without incarceration immediately preceding either event, a four-month period shall be created by aggregating the shorter periods of nonincarceration beginning with the most recent period of nonincarceration prior to commencement of the action and moving back in time.

*Id.* § 36-1-102(1)(A)(iv) (emphasis added). Here, DCS filed the petition to terminate

Father's parental rights on April 11, 2019. Father was incarcerated on that date and during part of the four-month period immediately preceding the filing of the petition. He had been incarcerated continuously since January 5, 2019. The trial court determined—and the record reflects—that the aggregate relevant four-month period for proving Father's abandonment of the Child was from August 28 to September 11, 2018 (fifteen days) and from September 21, 2018 to January 4, 2019 (105 days).

## A. Abandonment – Failure to Visit

Failure to visit occurs when a parent, "for a period of four (4) consecutive months, [fails] to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). "Token visitation" is "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." *Id.* § 36-1-102(1)(C). A parent may assert the absence of willfulness, which must be proved by a preponderance of the evidence, as an affirmative defense to abandonment by failure to visit. *Id.* § 36-1-102(1)(I). This Court has explained:

> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child.

*In re Audrey S.*, 182 S.W.3d at 864 (citations omitted); *see also In re Adoption of Angela E.*, 402 S.W.3d at 640 ("A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control.").

Ms. Hagarty, the assigned DCS case worker, stated that the Child was placed in DCS custody on May 23, 2018, two days after birth, due to prenatal exposure to Oxycodone. The Child has been in foster care continuously ever since. According to Ms. Hagarty, Father's only visit with Child while in foster care occurred on Christmas Day 2018. She said that Father's duty to visit the Child was included in the permanency plan that Father acknowledged receiving. Ms. Hagarty added that Father knew how to schedule visits and had contact information for the Child's foster parents. Father never complained of difficulty visiting the Child and was aware that DCS could assist him with transportation if needed. Ms. E., the Child's foster parent, confirmed that Father had her contact information, could call any time to visit, and visited on Christmas 2018. She recalled, however, Father visiting the Child a total of three to four times, including the day after the Child was placed with her.

Father testified that he had visited with the Child while in foster care more than once, the last visit taking place a few days after Christmas 2018. He stated that he lived in Lebanon, Tennessee, during the last four months before his latest period of incarceration, about 167 miles from the Child's foster home. Father said that sometimes he drove without a driver's license because he wanted to see the Child.

We agree with the trial court that Father engaged in no more than token visitation with the Child. The proof establishes that Father visited the Child at most three times during the relevant four-month period.[6] Father does not dispute that he had an obligation to visit the Child or that he knew how to contact the Child's foster parents to schedule visits. His only excuse for his minimal contact with the Child was the distance between his location at the time and the Child's foster home. Father knew, however, that DCS could assist him with transportation to visit the Child but did not seek assistance. We find that Father "has no justifiable excuse" for his failure to visit the Child less than a handful of times. *See In re Audrey S.*, 182 S.W.3d at 864. Moreover, we defer to the trial court's finding that there was no proof as to why Father failed to visit more often, which implicitly credits Ms. Hagarty's testimony that Father never complained about difficulty visiting the Child. *See T.M.B.K.*, 197 S.W.3d at 288 (stating that "the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings"). We thus affirm the trial court's finding that this ground was proven by clear and convincing evidence.

## B. Abandonment – Failure to Support

Failure to support occurs when a parent, "for a period of four (4) consecutive months, [fails] to provide monetary support or . . . more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). "Token support" means that "under the circumstances of the individual case, [support] is insignificant given the parent's means." *Id.* § 36-1-102(1)(B). A finding that a parent provided more than token financial support during the relevant four-month period precludes a finding of abandonment by failure to support. *In re Adoption of Angela E.*, 402 S.W.3d at 641; *In re Addalyne S.*, 556 S.W.3d 774, 787 (Tenn. Ct. App. 2018). An adult parent is presumed to know that he or she has a duty to provide support. Tenn. Code Ann. § 36-1-102(1)(H); *In re Braxton M.*, 531 S.W.3d 708, 724 (Tenn. Ct. App. 2017). A parent may assert, as an affirmative defense, that the failure to provide financial support was not willful. Tenn. Code Ann. § 36-1-102(1)(I).

Ms. Hagarty testified that Father did not pay child support or provide any other type

---

[6] Ms. E. testified that one of Father's visits occurred the day after the Child was placed under her care in May 2018, which is outside the beginning of the relevant four-month period in September 2018.

of support during the aggregate four-month period preceding his incarceration. She stated that the child support registry, which she personally reviewed, had no record of payment. According to Ms. Hagarty, Father never said he was unable to work; rather he told her that he did "handyman work and stuff like that." Ms. Hagarty asserted that Father was aware of this duty to provide support because the duty is outlined in the permanency plans prepared by the Department. On this point, the record contains a form signed by Father acknowledging his receipt of the criteria and procedure for termination of parental rights, including failure to support the Child. Ms. Hagarty added that Father knew how to contact the Child's foster parents.

Father testified that when he visited with the Child, he brought baby items such as toys, pacifiers, and bottles. Ms. E. confirmed that Father brought "little tokens . . . , maybe a toy or something like that[,]" a couple of times when he visited. Father stated that he had begun working for about a month at the detention facility's farm. He initially indicated that he did not work prior to his incarceration and that he had and filed for disability in 2014 because of a neck injury. However, he later clarified: "[E]ven though I was on disability, or filed for disability, I still had to live. So, I tried to work whatever I could do to maintain." On cross examination, Father admitted he had worked as a truck driver, drywall hanger, and manager of his own construction company before incarceration.

The trial court correctly found that the Father abandoned the Child by failing to provide support. In our view, the proof establishes that Father knew he had an obligation to support the Child, was able to work pre-incarceration, and knew how to contact the foster parents, but provided the Child with no more than token support during the relevant four-month period. Given Father's testimony of his ability to work in multiple capacities, we see no justification for his failure to support the Child financially. We affirm the trial court's finding that this ground was proven by clear and convincing evidence.

### C. Abandonment – Wanton Disregard

This Court has explained that "[a]n incarcerated or recently incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. To make this determination, trial courts examine "whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* Conduct displaying wanton disregard is not limited to parental conduct during the four-month relevant period. *Id.* at 871. Criminal activity, substance abuse, and failure to support or supervise a child may, individually or collectively, constitute behavior evidencing wanton disregard for the welfare of a child. *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *2-3 (Tenn. Ct. App. June 9, 2015) (citations omitted) (explaining this type of behavior tends to show "a 'me first'

attitude . . . and indifference to the consequences of the actions for the child").

Father's pre-incarceration actions reflected a wanton disregard for the Child's welfare. As we have discussed, Father provided no more than token support to and token visitation with the Child when he was not incarcerated. Not surprisingly, Ms. E. observed during Father's visits that no bond existed between him and the Child. Father himself admitted that the Child does not know him as her father. Moreover, Father was well aware that his parental rights could be terminated on the basis of wanton disregard for the welfare of the Child. He acknowledged receipt of the criteria and procedure for termination of parental rights on June 18, 2019, months before he began serving his most recent period of continuous incarceration. In addition, Ms. Hagarty testified that Father's criminal conduct exhibited "a selfishness, a need to not be there for the child, . . . and it's just a disregard for the child itself, the safety of the child, and the permanency of the child." We find it significant that, by the time of trial, Father's protracted criminal history had resulted in his losing custody of six children. The trial court correctly found that this ground was established by clear and convincing evidence.

### D. Substantial Noncompliance with Permanency Plan

Tennessee Code Annotated section 36-1-113(g) provides that parental rights may also be terminated on the ground of "substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). Making this determination entails "more than merely counting up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H.*, 483 S.W.3d at 537 (citing *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002)). This ground cannot be established simply by showing "that a parent has not complied with every jot and tittle of the permanency plan." *In re Ronon G.*, No. M2019-01086-COA-R3-PT, 2020 WL 249220, at *8 (Tenn. Ct. App. Jan. 16, 2020) (quoting *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004)). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656.

DCS bears the burden of showing "that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)); *accord* Tenn. Code Ann. § 37-2-403(a)(2)(C) ("Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights . . . if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement."). DCS must also establish "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular

requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656 (citations omitted). If the trial court does not make a finding with respect to the reasonableness of the parent's responsibilities under the permanency plan, the reviewing court must review this issue de novo. *See In re Valentine*, 79 S.W.3d at 547.

In this case, DCS satisfied its burden of proving Father's substantial noncompliance with the applicable permanency plan. Ms. Hagarty testified that DCS developed four different permanency plans after the Child was placed in its custody just two days after birth.[7] The record reflects that the trial court ratified each plan and found them to be reasonable, necessary to remedy the conditions that caused the Child's removal, and in the best interest of the child. Father's responsibilities under the November 2018 plan, which was in effect when DCS filed the petition to terminate Father's parental rights in April 2019, included: submitting to and following the recommendations of an alcohol and drug assessment and a psychological evaluation for dependency and mental health issues; submitting to random drug screens and avoiding others known to use illegal drugs; taking prescribed medications only as directed; obtaining and maintaining legal means to support Child; obtaining safe and stable housing; resolving any pending criminal charges and refraining from illegal activity; and visiting the Child a minimum of four hours per month.

Ms. Hagarty testified that Father received this permanency plan and did not indicate any problems with completing the prescribed tasks, yet he failed to complete a single task outlined in the plan. Father admitted that he "continued criminal activity" after the Child was born, and at the time of the hearing had been incarcerated for over one year. Ms. Hagarty said that Father would be unlikely to complete the plan in the future based on his history of incarceration and his failure to do any work toward completing the plan prior to incarceration. She noted that Father did not complete permanency plans developed by DCS to help him regain custody of his other six children. As to DCS's efforts to assist Father with completing the permanency plan, Ms. Hagarty said that DCS spoke with and visited Father while he was incarcerated. She personally went over the requirements of the permanency plan with Father. In her view, DCS' efforts to assist Father were thwarted by his inability to maintain contact.

Father's testimony was consistent with Ms. Hagarty's statements. He admitted not getting his other children back because he "chose" not to complete the permanency plans. As to Child, Father said he did not complete the permanency plan because he "didn't really think [he] had a problem with [Oxycodone], because it was the medication I was prescribed [for a neck injury]." Father did indicate that he completed a mental health and drug evaluation, as outlined in the permanency plan, but the record contains no documents corroborating his assertion. To the extent this contradicts Ms. Hagarty's testimony, we

---

[7] DCS introduced into evidence permanency plans dated June 7, 2018; November 30, 2018; May 15, 2019; and November 20, 2019.

must defer to the trial court's credibility findings and resolve the issue against Father. *See T.M.B.K.*, 197 S.W.3d at 288. In addition, Ms. Hagarty stated that she asked Father to provide her with any information showing his work toward completing the permanency plan, but Father provided none.

We conclude that the proof establishes that Father's failure to comply with the responsibilities identified in the permanency plan is substantial. He admitted to engaging in criminal activity after the birth of the Child, and his incarceration precluded him from securing legal means to support the Child and adequate housing. Moreover, before incarceration, he visited the Child a maximum of four times. His conduct after losing custody of the Child appears consistent with his failure to complete permanency plans for his other six children, which seriously jeopardizes any ability to complete any required tasks toward gaining custody of the Child in the future. We affirm the trial court's conclusion that this ground was proven by clear and convincing evidence.

### E. Failure to Manifest an Ability and Willingness to Assume Custody

Tennessee Code Annotated section 36-1-113(g)(14) provides an additional ground for termination:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This ground requires clear and convincing proof of two elements. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). The petitioner must first prove that the parent has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. Tenn. Code Ann. § 36-1-113(g)(14). The petitioner must then prove that placing the child in the custody of the parent poses "a risk of substantial harm to the physical or psychological welfare of the child." *Id.*

A split of authority exists as to what a petitioner must establish under the first prong of this ground for termination. *In re Katrina S.*, No. E2019-02015-COA-R3-PT, 2020 WL 5269236, at *8 (Tenn. Ct. App. Sept. 3, 2020). One panel of this Court has concluded that the first prong of the statute requires the petitioner to prove *both* an inability and an unwillingness of the parent to assume custody or financial responsibility for the child. *See In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018). Another panel of this Court later concluded that where the petitioner has proven that the parent has manifested an inability to assume custody or responsibility for

the child, the statute allows for termination of parental rights even if the parent has manifested a willingness. *See In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *12 (Tenn. Ct. App. June 20, 2018). This Court has also held that when a parent manifests neither a willingness nor an ability to assume custody, it is unnecessary to "adopt one approach over the other." *See, e.g.*, *In re Colton B.*, 2018 WL 5415921, at *10 (Tenn. Ct. App. Oct. 29, 2018); *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019).

Here, we need not address the split of authority because Father, by his acts and omissions, has failed to manifest both an ability and a willingness to assume custody and financial responsibility of the Child. Ms. Hagarty testified that Father has been in jail consistently throughout the Child's life and that, during the aggregate four-month period preceding his incarceration, Father failed to obtain suitable housing, provide financial support for, and visit the Child. Ms. Hagarty noted that Father's token visitation in light of the foster parents' open-door policy shows Father's failure to manifest a willingness to assume custody of the Child. Indeed, Father's own testimony supports a finding that this element has been satisfied. Father testified he is without permanent housing to offer the Child if and when he is released from incarceration. He admitted that he continued to engage in criminal conduct after the Child was born. Also, we are troubled by his failure to acknowledge responsibility for his own short-comings in working toward regaining custody of the Child: "[I]t's all because your wife fails a drug test, because you can't control her problems, and then you're still the one that gets voted out because of it." In sum, during the relevant four-month period, Father provided no more than token visitation and support to the Child, failed to show any work toward completing the permanency plan, engaged in conduct that landed him back in jail and rendered him unable to parent the Child, and did not take responsibility for his actions. Under these circumstances, we have no difficulty affirming the trial court's determination that DCS proved by clear and convincing evidence that Father manifested neither an ability nor a willingness to assume custody of the Child.

Turning to the second prong, whether placing the Child with Father would put the Child at risk of substantial physical or psychological harm, we find the evidence supports the trial court's conclusion that it would. Ms. Hagarty expressed serious concerns with the lack of permanency, housing, and financial stability inherent to Father's continuous criminal activity and incarceration periods—concerns not present with the Child's current foster placement. She noted that the Child resides with her two siblings whose permanent guardians are the Child's foster parents, and that "taking her away from that . . . would be detrimental to her." Related to this point, Ms. E. testified that, when visiting, Father "tried to play with [the Child], . . . loved on her and all that, but, I mean, she was, she was just a baby, so, you know, she didn't take to nobody but me and Frank, so." In her observation, there was no bond between Child and Father. On the other hand, Ms. E. said that the Child would be "devastated" if taken from her home because of the bond they have formed. We

find, as the trial court did, that DCS proved by clear and convincing evidence that placement with Father would pose a risk of substantial physical and psychological harm to the Child.

## II. Best interests of the Child

In addition to proving at least one statutory ground for termination, a party seeking to terminate a parent's rights must prove by clear and convincing evidence that termination is in the child's best interests. *See* Tenn. Code Ann. § 36-1-113(c). Indeed, "a finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187 (Tenn. Ct. App. 2004)). Rather, our termination statutes recognize that "not all parental conduct is irredeemable[,]" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* As such, the focus of the best interests analysis is not the parent but the child. *Id.*; *see also White*, 171 S.W.3d at 194 ("[A] child's best interest must be viewed from the child's, rather than the parent's, perspective.").

Tennessee Code Annotated section 36-1-113(i) provides nine factors for analyzing best interests:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

This list is non-exhaustive. *In re Marr*, 194 S.W.3d at 499. "Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *Id.* "The relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* "Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 877).

We conclude the trial court correctly found that the factors in Section 36-1-113(i), individually and collectively, weigh in favor of termination. Father's circumstances and conduct did not improve after the Child was removed from his (and Mother's) custody two days after birth. *See* Tenn. Code Ann. § 36-1-113(i)(1). He did not complete the alcohol and drug assessments required by the permanency plan, failed to obtain suitable housing, and had been incarcerated for over three months by the time the petition to terminate his parental rights was filed. Father failed to adjust his conduct even after DCS attempted to assist him. *Id.* § 36-1-113(i)(2). Ms. Hagarty stated that she personally went over the requirements of the permanency plans with Father but that DCS's efforts to assist Father were thwarted by his failure to maintain contact. There is no proof in the record that Father took any steps to fulfill his responsibilities under any of the four permanency plans DCS developed between removal of the Child from Father's custody and trial. His efforts in this case toward completing the permanency plans continue to exhibit the lack of priority or urgency he exhibited toward regaining custody of his other six children. Perhaps this is most clearly evidenced by his failure to visit the Child more than a handful of times during the four-month aggregate period before his incarceration. *Id.* § 36-1-113(i)(3). Ms. Hagarty and Ms. E. testified that the Child's foster home had an "open door" policy and that Father knew how to contact the foster parents to schedule visit. Yet he did not avail himself of the opportunity to maintain regular contact with the Child, and no meaningful relationship developed between Father and Child. *Id.* § 36-1-113(i)(4). It was clear to Ms.

E. that no bond had formed between them, and Father himself conceded that the Child would not know him as a father.

The evidence is clear that removing the Child from the foster home would adversely impact the Child. *Id.* § 36-1-113(i)(5). Emotionally, Ms. E. said that the Child would be "devastated" if removed from her home because of the bond formed not only with the foster family, but also with her two siblings who also live there. Psychologically, the Child's stability at the foster home would be replaced with the uncertainty attached to Father's history of incarcerations and arrests. This history of criminal conduct undoubtedly played a role in the Father's neglect of the Child. *Id.* § 36-1-113(i)(6). Unfortunately, the Father's neglect—evidenced by his lack of visitation and support for the Child—was not limited to his periods of incarceration. And so, at the time of trial, Father could not offer the Child a healthy, safe, and stable home due to his incarceration. *Id.* § 36-1-113(i)(7). Father does not have a permanent home to return to upon release.[8] Father testified that in the months prior to his last incarceration he stayed at his uncle's home or a motel. Conversely, the proof shows that the Child currently enjoys a safe and stable environment at the foster home, having established a bond with both her foster parents and two siblings. As Father put it, "I know they are taken care of, that's something I'll never have to worry."

We also find that Father's actions after the birth of the Child reflect a state of mind that would be detrimental to the Child should he regain custody. *Id.* § 36-1-113(i)(8). Ms. Hagarty expressed her concern that Father's continued criminal activity evidenced a "me first" attitude. We agree. As Father admitted, he engaged in conduct leading to theft charges multiple times after the Child was born. Moreover, even after losing custody of six children, Father made negligible efforts, if any, to complete his responsibilities under the permanency plans developed to regain custody of the Child. Finally, Father neither paid child support nor provided more than token support to the Child during the relevant period, or thereafter. *Id.* § 36-1-113(i)(9).

Father's argument boils down to blaming his failure to visit, provide support, and complete the permanency plans on an unsubstantiated claim of a previous neck injury. According to Father, a neck injury resulted in his Oxycodone dependency which played a role in his criminal conduct and made him unable to hold a steady job. He insists he will have the "potential" to fulfill his parental responsibilities upon release from prison because he no longer has a chronic injury necessitating use of Oxycodone. Even if we were inclined to find Father's claims persuasive, which we do not, Father failed to address how the trial court committed legal error in its application of the statutory best interests factors. *See id.* § 36-1-113(i)(1)-(9). We are not willing to gamble with the Child's welfare on the basis of what Father thinks he can do, when he has shown little inclination to support his Child.

---

[8] Father testified that his sentence runs through April 2022. Although he asserted that he would be released in parole in March 2020, we are unwilling to presume early release without corroborating evidence.

- 19 -

Accordingly, we affirm the trial court's finding that DCS proved by clear and convincing evidence that terminating the Father's parental rights is in the Child's best interests.

## **CONCLUSION**

We affirm the judgment of the White County Juvenile Court in its entirety. Costs of this appeal shall be taxed to the Appellant, Darrell R., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE
